1997–NMCA–019

934 P.2d 308

STATE of New Mexico, ex rel., CHILDREN, YOUTH AND FAMILIES DEPARTMENT, Petitioner/Appellee,

v.

In the Matter of JOHN D., a child, and Concerning Anna D., Respondent/Appellant.

No. 17309.

Court of Appeals of New Mexico.

Feb. 12, 1997.

116

Tom Udall, Attorney General, Angela Adams, Chief Children's Court Attorney, Diane Garrity and James Lyons, Children's Court Attorneys, Children, Youth and Families Department, Santa Fe, for Petitioner/Appellee.

Marcia L. Lander, Albuquerque, for Respondent/Appellant.

## OPINION

APODACA, Judge.

1. Mother appeals the termination of her parental rights to her child, John (Child). Two basic issues are presented to us: (1) whether there was clear and convincing evidence to support the children's court's findings regarding the conditions under NMSA 1978, Section 32A–4–28(B)(3) (Repl. Pamp.1995), and (2) whether the Americans with Disabilities Act (ADA) impacts this case. *See* 42 U.S.C. § 12132 (1995). We affirm the termination of Mother's parental rights and conclude there was clear and convincing evidence to support the children's court's findings. We also conclude that, under the particular facts of this case, Mother failed to establish the elements necessary to invoke the provisions of the ADA.

## I. FACTUAL AND PROCEDURAL BACKGROUND

2. Mother has a history of chronic mental illness and has been variously diagnosed as paranoid schizophrenic or as suffering from schizoaffective disorder, bipolar type. The

Children, Youth and Families Department (the Department) filed an abuse and neglect petition on August 24, 1993. Mother was represented by an attorney and a guardian ad litem. Later, on April 7, 1995, the Department filed a petition to terminate Mother's parental rights. The children's court terminated Mother's parental rights after finding the statutory conditions for presumptive abandonment under Section 32A–4–28(B)(3). *See generally In re Adoption of J.J.B.,* 119 N.M. 638, 894 P.2d 994 (1995).

3. Specifically, the children's court found Child had been constructively abandoned and placed in the care of his maternal aunt where the following conditions existed: Child had been living with his aunt for approximately two years; the parent-child relationship had disintegrated; a psychological parent-child relationship developed between Child and aunt; Child expressed a preference to live with the aunt, fears his mother, and does not wish to live with her; and the aunt desires to adopt Child. The children's court also determined that termination of parental rights would promote Child's physical, mental, and emotional welfare and needs.

4. In the order terminating Mother's parental rights, the children's court refused to adopt any findings regarding the reasonableness of the efforts the Department made to assist Mother because it deemed such findings unnecessary. *Compare* NMSA 1978, § 32A–4–28(B)(2) (Repl.Pamp.1995) (termination based on abuse and neglect) *with* § 32A–4–28(B)(3) (termination based on presumptive abandonment).

5. In the initial judgment and disposition adjudicating the abuse and neglect petition, the children's court had found that Child was abused and neglected and that the Department had used reasonable efforts to prevent removal of Child from the home and continued to use reasonable efforts in reunifying Child with Mother. *See* NMSA 1978, § 32A–4–22(A)(9) (Repl.Pamp.1995). It also found in two judicial review orders that the Department had made reasonable efforts to return Child to the home and to implement the treatment plan previously adopted by the children's court. *See* NMSA 1978, § 32A–4–25(C) (Repl.Pamp.1995). With some modifi-

cations, the children's court adopted the treatment plans presented by the Department. These orders were not appealed, and our review of this case is limited to the order terminating Mother's parental rights. Additional facts will be addressed in our discussion of the issues.

## II. DISCUSSION

### A. The Evidence—Was It Clear And Convincing?

6. Section 32A–4–28 provides three sets of circumstances under which the children's court can terminate parental rights. In the present case, the children's court found existing the conditions listed in subparagraphs (a) through (e) of Section 32A–4–28(B)(3). Section 32A–4–28(B)(3) permits termination of parental rights when:

the child has been placed in the care of others, including care by other relatives, either by court order or otherwise and the following conditions exist:

(a) the child has lived in the home of others for an extended period of time;

(b) the parent-child relationship has disintegrated;

(c) a psychological parent-child relationship has developed between the substitute family and the child;

(d) if the court deems the child of sufficient capacity to express a preference, the child no longer prefers to live with the natural parent;

(e) the substitute family desires to adopt the child; and

(f) a presumption of abandonment created by the conditions described in Subparagraphs (a) through (e) of this paragraph has not been rebutted.

The existence of these conditions created a rebuttable presumption of abandonment under Section 32A–4–28(C).

7. The inquiry in cases under Section 32A–4–28(B)(3) must focus on the effect of the parent's conduct on the child and not on any subjective intent to abandon the child. *See J.J.B.,* 119 N.M. at 648, 894 P.2d at 1004; *see also In re Samantha D.,* 106 N.M. 184, 187, 740 P.2d 1168, 1171 (Ct.App.1987). . Be-

cause "evidence of the disintegration of the parent-child relationship is of no consequence if not caused by the parent's conduct," the presumption of abandonment created by Section 32A–4–28(B)(3)(a) to –(e) "is completely rebutted by showing that a parent lacks responsibility for the destruction of the parent-child relationship." *J.J.B.*, 119 N.M. at 648–49, 894 P.2d at 1004–05.

8. Unlike *J.J.B.*, however, Child was removed from Mother's custody because of referrals of child abuse and neglect. The referral leading to filing the initial abuse and neglect petition in this case occurred in the summer of 1993 and involved mother force-feeding Child in the cafeteria of the Bernalillo County Mental Health Center until Child vomited. Mother became upset, asked Child if she had to kill him, and took Child into the restroom where she was seen striking him. Child was again taken from Mother's custody a few months later after a social worker observed bruises and cigarette and other burns on Child and the treating pediatrician expressed her opinion that Child's condition was consistent with child abuse and diagnosed Child as failing to thrive. This evidence would support a determination that Child was removed from Mother's custody based on Mother's conduct toward Child and that Mother was responsible for having Child removed.

9. Later, after Child had been removed from her custody, Mother had three supervised visitations with Child. These visitations were terminated, however, after building security was called during the last visitation because the social worker believed Mother's behavior threatened the safety of Child. Child's guardian ad litem asserted that visitation was against Child's best interests. Additionally, Mother's guardian ad litem stated that not having visitation was in Mother's best interests because, without visitation, she was not in a position to commit violent or criminal acts against her son. Unlike the situation in *J.J.B.*, then, the evidence in this appeal failed to establish that Mother was not responsible for the disintegration of the parent-child relationship. Instead, these facts established Mother was directly responsible

for the disintegration the children's court determined had occurred. *See, e.g., Samantha D.*, 106 N.M. at 187–88, 740 P.2d at 1171–72 (mother who signed an invalid consent to adoption was held responsible for the disintegration of the parent-child relationship); *cf. J.J.B.*, 119 N.M. at 650–51, 894 P.2d at 1006–07.

■ 10. We are also not persuaded that Mother's disability alone can negate or override her responsibility for her conduct. As we already noted, the inquiry must focus on the effect of the parent's conduct toward the child rather than on any subjective intent the parent might have. *See J.J.B.*, 119 N.M. at 648, 894 P.2d at 1004; *see generally State ex rel. Health & Social Servs. Dep't v. Natural Father*, 93 N.M. 222, 225, 598 P.2d 1182, 1185 (Ct.App.1979) (affirmed determination that children were neglected based on the parents' lack of mental capacity).

■ 11. We acknowledge the Department's obligations under state law to make reasonable efforts to assist parents in abuse and neglect proceedings. *See generally State v. Penny J.*, 119 N.M. 328, 333, 890 P.2d 389, 394 (Ct.App.1994). Nonetheless, we need not address Mother's arguments that the Department failed to accommodate her disability in developing and implementing the treatment plans because Mother's parental rights were not terminated pursuant to Section 32A–4–28(B)(2), which explicitly requires reasonable efforts to assist the parent to properly care for the child before parental rights may be terminated.

■ 12. To the extent Mother argues that evidence of the Department's failure to accommodate her disability as required by state law would rebut the presumption of abandonment under Section 32A–4–28(B)(3), we observe that, unlike Section 32A–4–28(B)(2), Section 32A–4–28(B)(3) does not require the Department to establish the reasonableness of efforts it may have made to assist a parent. Mother's claims that the Department failed to accommodate her disability in violation of the ADA are discussed separately below.

13. We conclude that the evidence supports the children's court determination that

the Department established by clear and convincing evidence the existence of the conditions under Section 32A–4–28(B)(3)(a) to –(e). Establishment of the conditions created a rebuttable presumption of abandonment, which Mother failed to overcome. We therefore conclude that the children's court did not err in terminating Mother's parental rights.

### B. The ADA—Does It Impact This Appeal?

14. Mother also contends that the Department violated Section 12132 of Title II of the ADA. That section states: "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The ADA's application to proceedings to terminate parental rights was raised previously in *Penny J.*, 119 N.M. at 331–32, 890 P.2d at 392–93. In *Penny J.*, however, this Court did not decide the issue because the ADA was not in effect during the relevant time in that case. In this case, we determine that, although the ADA could impact on termination proceedings based on presumptive abandonment, the facts of this case did not require the children's court to grant relief based on the ADA's requirements.

15. The legislative history of the ADA indicates the purpose of the ADA's Title II was to extend the non-discrimination policy contained in the Rehabilitation Act (which applied only to entities receiving federal funding) to *all* actions of state and local governments. See S.Rep. No. 101–116, at 44 (1989); H.R.Rep. No. 101–485, pt. 2, at 84 (1990), *reprinted in* 1990 U.S.C.C.A.N. 267, 366–67. *See also* Thomas, Anne B., "Beyond the Rehabilitation Act of 1973: Title II of the Americans with Disabilities Act," 22 N.M.L.Rev. 243, 243–51 (1992); Mikochik, Stephen L., "The Constitution and the Americans with Disabilities Act: Some First Impressions," 64 Temple L.Rev. 619, 624–25 (1991).

16. The legislative history also makes clear Congress' intent that Section 12132 (the section of the ADA at issue in this appeal) should be interpreted consistently with *Alexander v. Choate*, 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985). *See* H.R.Rep. No. 485, U.S.Code Cong. & Admin.News 1990, p. 84, *supra.* In *Alexander*, handicapped medicaid recipients challenged a Tennessee medicaid cost-cutting proposal that threatened reduction of the number of inpatient hospital days covered by the medicaid program, arguing that the reduction violated the Rehabilitation Act by its disparate impact on handicapped individuals. Although denying relief to plaintiffs in the context of the medicaid programs at issue in *Alexander*, the U.S. Supreme Court nonetheless stated as a general rule that "reasonable accommodations in the grantees program or benefit may have to be made" in order to assure otherwise qualified handicapped persons meaningful access to services and benefits to which they are entitled. 469 U.S. at 301, 105 S.Ct. at 720.

17. We understand Section 12132 of the ADA to apply in situations where a state has a statutory duty or otherwise undertakes to assist a person. *See, e.g., Stone v. Daviess County Div. of Children & Family Servs.*, 656 N.E.2d 824, 830–31 (Ind.Ct.App.1995) (where state statute required state to provide services to parents before terminating parental rights, an ADA violation would be grounds for attacking the termination, but where the statute providing grounds for termination does not include a duty to provide services, an ADA discrimination claim cannot be the basis to attack a termination order). *Cf. In re Torrance P.*, 187 Wis.2d 10, 522 N.W.2d 243, 245–46 (1994) (whether state made diligent effort to provide parents with court-ordered services as required by state statute was separate inquiry from the question of whether state made reasonable accommodations under ADA).

18. In the context of this appeal, the Department was required to assist Mother throughout the abuse and neglect proceedings. Nonetheless, because Mother's parental rights were terminated only under Section 32A–4–28(B)(3), we consider the ADA's impact only on the specific proceedings that

**120**

resulted in the termination of parental rights under Section 32A–4–28(B)(3), not on any of the earlier proceedings.

19. We have previously noted that the Department is not required to prove the reasonableness of its efforts to assist a parent when parental rights are terminated under Section 32A–4–28(B)(3) (presumptive abandonment), as opposed to Section 32A–4–28(B)(2) (abuse and neglect), which does so require. The ADA, however, might indeed apply in the context of a Section 32A–4–28(B)(3) abandonment to the extent that Mother could establish a violation of the ADA in the rebuttal of any evidence establishing Mother's presumptive abandonment. That is, the ADA's provisions could be used to argue that the Department violated the ADA and as a result the parent lacked responsibility for the destruction of the parent-child relationship.

20. In this case, however, Mother does not specifically argue on appeal that she presented evidence sufficient to rebut the presumption of abandonment. Nor did she tender specific findings and conclusions below to support that proposition. In fact, she acknowledged that the conditions supporting the presumption were proved and that the presumption was not rebutted. Her argument concerning the ADA appeared to concentrate on reasonable efforts by the Department, which of course is part of the Section 32A–4–28(B)(2) ground for termination and not the Section 32A–4–28(B)(3) ground, on which the children's court relied. The children's court orally commented that it was going to enter findings only on the matters essential to its decision. Contrary to the facts in *J.J.B.*, the evidence was sufficient for the children's court to find that Mother was responsible for the destruction of the parent-child relationship despite reasonable efforts by the Department, and that the ADA could not be used under the facts of this case to shift that responsibility. *See State v. Garcia,* 98 N.M. 186, 188, 646 P.2d 1250, 1252 (Ct. App.1982) (where the trial court does not make specific findings, inquiry on appeal is whether substantial evidence supports any theory that would support the judgment).

21. To establish a violation of Section 12132, however, Mother bore the burden of establishing that she was a qualified individual with a disability. *See* 42 U.S.C. § 12132; *see generally Tyler v. City of Manhattan,* 857 F.Supp. 800, 817 (D.Kan. 1994) (outlining what a plaintiff must show to establish a violation of Title II). Section 12131(2) defines a qualified individual with a disability as someone "who, with or without reasonable modifications to rules, policies, or practices ... meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). To decide whether an individual fits that definition, a lower court must determine whether the eligibility requirements are necessary and, if so, must conduct an individualized inquiry into whether reasonable modifications can be made in the case. *See Aughe v. Shalala,* 885 F.Supp. 1428, 1432 (W.D.Wash.1995); *see, e.g., Easley by Easley v. Snider,* 36 F.3d 297, 301–06 (3d Cir.1994) (mental alertness may be an essential eligibility requirement where claimant's severe degree of mental disability rendered participation in the program ineffectual); *Franklin v. United States Postal Serv.,* 687 F.Supp. 1214, 1219 (S.D.Ohio 1988) (person with history of antisocial behavior whose condition of paranoid schizophrenia is not controllable by medication or is otherwise a danger to public and coworkers is not an otherwise qualified handicapped individual).

22. The evidence presented in the children's court established that Mother refused to cooperate or participate voluntarily in the treatment plans. As stated by the children's court, it would take extraordinary, rather than reasonable, efforts to get Mother to participate voluntarily in the treatment plan. The treatment plans required Mother to take the medication prescribed for her disability and to engage in therapy to the extent possible. Evidence was adduced that the social worker asked Mother about taking her medication on more than one occasion and Mother's response was that she did not have to do anything she did not want to do. There was testimony that notes from the University of New Mexico Medical Center stated that Mother refused treatment multiple times.

These same records also indicated she had been prescribed medications multiple times and she had not taken the medications on a consistent basis.

23. During some of the earlier proceedings, Mother began receiving treatment for her mental illness only after Adult Protection Services intervened. This intervention occurred when it was determined that Mother was a danger to herself, the police broke into her home to forcibly remove her, and she was committed to the UNM mental health center. Mother refused to take her medication while a patient at UNM.

24. Additionally, there was evidence that the Department made three appointments for Mother to have a psychological evaluation, but Mother did not keep the appointments. Both Child's guardian and the social worker tried to get Mother to comply with the treatment plans, but Mother was verbally abusive and physically violent.

25. Under these circumstances, we conclude that the children's court was not required to find that Mother presented sufficient evidence to grant her relief based on the ADA's application to presumptive abandonment. Even the ADA itself does not require unwilling disabled individuals to participate in programs and services. *See* 42 U.S.C. § 12201(d) ("Nothing in this chapter will be construed to require an individual with a disability to accept an accommodation, aid, service, opportunity, or benefit [that] such individual chooses not to accept."). To conclude otherwise would be to hold that the ADA required the Department to force Mother to participate in its programs and services, which in this case might even have required the Department to commit Mother involuntarily.

26. Consequently, we hold that the findings of the children's court (concerning the elements of presumptive abandonment) were not erroneous. We also hold that the children's court did not err in refusing Mother's tendered findings concerning the Department's reasonable efforts.

## III. CONCLUSION

27. In affirming the termination of Mother's parental rights, we are mindful of this case's tragic course. We also realize the "Catch–22" dilemma faced by those individuals involved in this case—Mother's disability was the primary reason she was unable or unwilling to participate in the programs and services intended to assist her in overcoming that disability, which in turn prevented her from properly caring for Child. We are equally mindful, nevertheless, that the best interests of Child must take precedence over Mother's interest in parenting. *See Samantha D.*, 106 N.M. at 186, 740 P.2d at 1170 (any rights parents have to their children are secondary to the best interests and welfare of the child).

28. This appeal demonstrates the futility we may often experience when our laws prove inadequate or imperfect in addressing certain social problems. The social motives behind both the federal and state laws discussed in this opinion are good ones. Nonetheless, it sometimes happens that, in trying to address legislatively the problems of our society's less fortunate, we clearly reveal that our laws cannot always adequately, much less successfully, address every human condition.

29. The order terminating Mother's parental rights is affirmed.

30. **IT IS SO ORDERED.**

PICKARD and BUSTAMANTE, JJ., concur.