MAES, Justice (dissenting). {57} On motion for rehearing, the dissenting opinion filed June 12, 2014, is withdrawn, and the following dissenting opinion is substituted in its place. {58} I believe the mere fact that a formerly absent parent, without justification for his or her absence, reappears immediately prior to a termination proceeding does not impose a duty upon CYFD to make reasonable efforts to reunify the family and termination is appropriate under Subsection (B)(1). The majority holds otherwise; thus, I respectfully dissent. I. THE COURT OF APPEALS’ MEMORANDUM OPINION AFFIRMING THE TERMINATION OF FATHER’S PARENTAL RIGHTS {59} After the district court terminated his parental rights, Father appealed to the Court of Appeals. See In re Maurice H., No. 31, 597, mem. op. (N.M. Ct. App. Mar. 25, 2013) (non-precedential). I begin with a summary of the Court of Appeals’ proceedings and holding. {60} In the Court of Appeals, Father argued that when a parent appears prior to the termination of rights proceeding and seeks custody of his or her child, “the Act should be construed to require the district court to consider termination of parental rights under the abuse and neglect provision], Subsection] (B)(2), rather than under Subsection (B)(1).” Id. ¶ 6. Father asserted that this is because there is a more rigorous standard for termination of rights under Subsection (B)(2) and the Act provides no guidance for when the Legislature intended that each subsection be used. Id. Father insisted that Subsection (B)( 1) was enacted only to allow CYFD to terminate parental rights when a parent does not appear before termination, is not seeking custody, and/or is unwilling to assume full financial responsibility for the child. Id. ¶ 9. This construction, Father contended, is supported by the Legislature’s intent to keep the family together. Id. {61} The Court of Appeals noted that Father did not appeal the district court’s finding that he abandoned Grace but “asserts as a dispositive fact that he appeared prior to termination of his parental rights and sought custody of [Grace].” Id. ¶ 2. The Court determined that on appeal Father “solely raise[d] an issue of statutory construction, arguing that because he sought custody prior to termination of his parental rights ... the district court [could] only terminate those rights pursuant to Section 32A-4-28(B)(2), which first requires CYFD to make reasonable efforts to reunite the family.” Id. {62} The Court of Appeals held that when read as a whole, the clear language of the Act allows for termination of parental rights pursuant to Subsection (B)(1), without reasonable efforts to reunify, even when the parent seeks custody prior to termination. Id. ¶ 7. In looking at the plain text of the statute, the Court of Appeals concluded that “CYFD is statutorily required to engage in reasonable efforts to reunite the parent and child under Section 32A-4-28 only when it seeks a termination based upon a parent’s abuse and neglect,” pursuant to Subsection (B)(2). Id. ¶ 4. Therefore, CYFD is not held to a reasonable efforts standard when it chooses to pursue parental rights termination under either Subsection (B)(1) or (B)(3). {63} Father appealed to this Court and we granted Father’s petition for certiorari to address three questions: (1) whether the New Mexico Legislature intended to limit the application of Section 32A-4-28 (B)(1) to parents who fail to appear altogether prior to the termination of parental rights hearing, (2) whether CYFD is required to make reasonable efforts to reunite a child and a parent when a parent, who has abandoned his child for the statutory period specified in Section 32A-4-2(A), appears, seeks custody, and accepts financial responsibility for his child prior to a termination of parental rights hearing, and (3) whether the Legislature intended for CYFD to have unfettered discretion to pursue a termination of parental rights pursuant to either Section 32A-4-28(B)(l) or Subsection (B)(2). 11. STANDARD OF REVIEW {64} “In proceedings seeking the termination of parental rights, the grounds for any attempted termination must be proved by clear and convincing evidence.” State ex rel. Dep’t Human Servs. v. Peterson, 1985-NMCA-102, ¶ 17, 103 N.M. 617, 711 P.2d 894. A district court’s decision to terminate parental rights will be upheld “if it applied the proper rule of law.” Id. Neither party disputes that Father’s conduct constituted abandonment by clear and convincing evidence. Thus, we are left to resolve whether the district court pursued termination of rights under the wrong subsection of Section 32A-4-28(B). {65} Our interpretation of a statute is a question of law that an appellate court reviews de novo. State v. Tafoya, 2010-NMSC-019, ¶ 9, 148 N.M. 391, 237 P.3d 693. “We begin by looking at the language of the statute itself.” State v. Smith, 2004-NMSC-032, ¶ 9, 136 N.M. 372, 98 P.3d 1022. In addition to the plain language, “we also consider the history and background of the statute.” State v. Rivera, 2004-NMSC-001, ¶ 13, 134 N.M. 768, 82 P.3d 939. This Court does not read into a statute “language which is not there, particularly if it makes sense as written.” High Ridge Hinkle Joint Venture v. City of Albuquerque, 1998-NMSC-050, ¶ 5, 126 N.M. 413, 970 P.2d 599 (internal quotation marks and citation omitted). “[W]e must read different legislative enactments as harmonious instead of as contradicting one another.” State v. Muniz, 2003-NMSC-021, ¶ 14, 134 N.M. 152, 74 P.3d 86, superseded in part by statute, NMSA 1978, § 32A-2-20(A), (G) (2005), as recognized in State v. Jones, 2010-NMSC-012, ¶ 19, 148 N.M. 1, 229 P.3d 474. III. DISCUSSION {66} The majority overrules the Court of Appeals because it disagrees that the issue before this Court is “a question of when the Department has the authority to move for termination of parental rights on a theory of abandonment under Subsection (B)(1) versus Subsection (B)(2).” Opinion, ¶ 39. Instead, it “raises the question: If the entire case was proceeding under Subsection (B)(2), and if Subsection (B)(2) gives the district court the same authority to terminate parental rights by abandonment, then why did the district court shift from Subsection (B)(2) and terminate Father’s parental rights under Subsection (B)(1)?” Id. The basis for this question is the assumption that the district court proceeded under Subsection (B)(2) “throughout the life of the case,” because it ordered a treatment plan for Father at the beginning of the case, therefore the district court should have terminated by abandonment under Subsection (B)(2) and not Subsection (B)(1). Id. ¶ 39. This assumption is incorrect because the family treatment plan adopted was as to Mother and Justin, her boyfriend, and the trial court did not have jurisdiction to order treatment for Father. The family treatment plan and predisposition study attached to the stipulated judgment and’ disposition as to Mother and Justin does reference Father and did indicate that Father would be assessed for treatment, sign a release of information and provide relatives names for possible placement, admit harmful effects of substance abuse, and participate in a paternity test. But while Mother and Justin are mentioned in the summary of the treatment plan which outlined their treatment, it did not mention Father. Further, the stipulated judgment and disposition entered on March 16, 2009, indicated that Father had not been located or served, did not appear at the hearing and still had not reappeared in Grace’s life. It is only after adjudication that the court can “order the department to implement and the child’s parent ... to cooperate with any treatment plan approved by the court.” See § 32A-4-22(C)(2009). Not having an attorney and not being present, the district court did not have jurisdiction to order treatment for Father or to adjudicate his rights. {67} It is also unclear which part of the Court of Appeals’ opinion is being reversed by the majority. The majority holds that “it becomes clear to this Court that the Legislature intended Subsection (B)(1) to be used when there is no parent present with whom the Department could work towards reunification prior to termination.” Opinion, ¶ 40. Yet seemingly contradictory, the majority also holds that “[t]he district court had at least some justification for finding abandonment under Subsection (B)(1) because, under a plain language reading of the statute, there was at least one three-month period during which, without justification, Father neither communicated with, nor provided for [Grace].” Id. {68} In fact, the majority opinion does not challenge any legal analysis in the Court of Appeals’ opinion and appears to address only the third issue raised in Father’s petition for certiorari — whether the Legislature intended for CYFD to have unfettered discretion to pursue a termination of parental rights pursuant to either Section 32A-4-28(B)(l) or Subsection (B)(2). However, the issue at hand is not whether CYFD could have acted more sympathetically toward Father, but whether the district court properly ordered the termination of Father’s parental rights based on abandonment pursuant to Subsection (B)(1). {69} Section 32A-4-28(B), which outlines the process for terminating parental rights, provides that the court must terminate parental rights when (1) the child has been abandoned by his parents, (2) the child has been abused or neglected and such conditions “are unlikely to change in the foreseeable future despite reasonable efforts by the department ... to assist the parent in adjusting the conditions that render the parent unable to properly care for the child,” or when (3) “a presumption of abandonment [has been] created.” See § 32A-4-28(B)(l)-(3). {70} Father argues to this Court that one of the statutory factors of a “neglected child” is one who was “abandoned,” and thus abandonment is a form of neglect that requires the higher standard of termination (i.e. reasonable efforts) when a parent is present. See §32A-4-2(E)(l) (defining a “neglected child” to include one who has been abandoned by the parent). According to Father, once he reappeared CYFD could have taken alternative action and pursued termination of parental rights under Subsection (B)(2) in order to allow Father to remedy the conditions that rendered him unable to parent Grace. I disagree. {71} From the plain language it is clear that the only time the statute mandates that CYFD make “reasonable efforts” to “assist the parent in adjusting the conditions that rendered] the parent unable to properly care for the child” prior to termination of rights is when a child has been “neglected or abused” pursuant to Subsection (B)(2). Section 32A-4-28(B)(2). Thus, a termination pursuant to Subsection (B)(2), abuse or neglect, requires the implementation of a treatment plan, which the district court perio dically monitors prior to termination. See id. {72} The statute is silent as to when it intendedfor courts to affirm Subsection (B)(1) termination as opposed to Subsection (B)(2). Peterson, the only case to speak to a court’s choice between abandonment and neglect, held that the two provisions are “separate, independent grounds for terminating parental rights. . . . each is alternative to the other.” 1985-NMCA-102, ¶ 16. {73} The Court of Appeals found that because Subsection (B)(1) “only requires a finding [of abandonment] and no treatment plan is mandated for parents who abandon their children... the Legislature generally did not intend for terminations based on abandonment to require findings about reasonable efforts.” Maurice H., No. 31, 597, mem. op. ¶ 8. I agree with the Court of Appeals and submit that this holding is not novel. See State ex rel. Children, Youth & Families Dep’t v. Amy B., 2003-NMCA-017, ¶ 2, 133 N.M. 136, 61 P.3d 845 (stating that cases of actual abandonment do not require a finding of reasonable efforts on behalf of CYFD to assist the parent); see also State ex rel. Children, Youth & Families Dep’t v. John D., 1997-NMCA-019, ¶ 12, 123 N.M. 114, 934 P.2d 308 (noting that unlike Subsection (B)(2), presumptive abandonment under Subsection (B)(3) does not require CYFD to establish reasonableness of efforts to assist the parent). Further, “[t]here is no indication that the parent who has abandoned the child must receive services or benefit from a treatment plan.” State ex rel. Children, Youth & Families Dep’t v. Benjamin O., 2009-NMCA-039, ¶ 31, 146 N.M. 60, 206 P.3d 171. {74} But as in Benjamin O., there is no indication here that Father, who abandoned Grace, must receive services or the benefit of a treatment plan. The record shows that Father had not seen Grace since three months after her birth in 2006. In December 2008, CYFD took Grace into custody because Mother was unable to care for Grace. Father was still absent at that time. On March 18, 2010, CYFD filed for a termination of Father’s parental rights and requested a hearing on the matter on April 18, 2010. On April 19, 2010, Father made his first contact with CYFD, inquiring about Grace. At this time Father had been absent from Grace’s life for four years. Father expressed a desire to adopt Grace and Brother but CYFD explained to Father that permanency was in Grace’s best interests and it was proceeding with the termination proceeding. {75} Adopting Father’s argument, the majority reads into Subsection (B)(1) the requirement that the parent never reappear to seek custody as a qualifying event prior to CYFD pursuing termination based solely on abandonment. Such an interpretation would deem Subsection (B)(1) superfluous, which is contrary to our rules of statutory interpretation. See Baker v. Hedstrom, 2013-NMSC-043424, 309 P.3d 1047 (“This Court must interpret a statute so as to avoid rendering the Legislature’s language superfluous.”). And as previously discussed, this interpretation conflicts with long-standing statutory construction principles. See, e.g., High Ridge Hinkle Joint Venture, 1998-NMSC-050, ¶ 5. Accordingly, I agree with the holding of the Court of Appeals that “[w]e will not read additional language into the statute to restrictthe Subsection (B)(1) ground for termination by abandonment only to instances where the parent does not want custody, especially when the statute is logically sound as written.” Maurice H., No. 31, 597, mem. op. ¶ 11. {76} Under the facts of this case, CYFD sought to terminate Father’s rights under the sole theory of abandonment as there was no evidence of neglect. The disjunctive nature of Section 32A-4-28(B) suggests that the Legislature intended to protectyoung children from abandonment. See § 32A-4-2(A)(2)(a) (defining abandonment as only a three-month period if the child is under six years old). By making “abandonment,” without the procedural safeguards seen in Subsection (B)(2), an exception to the Legislature’s usual concern for terminating parental rights, it is conceivable that the Legislature intended to prevent the reunification of a formerly absent parent in order to protect the child. Although Father may now want to parent, under the statutory scheme, Father abandoned Grace and is subject to those consequences — to hold otherwise weakens the Act’s intent to protect children from abandonment. See Benjamin O., 2009-NMCA-039, ¶ 31. {77} I also disagree with the majority’s conclusion that the various instances of the Department’s misconduct and “the repeated miscarriage of the process deprived the district court of the opportunity to make a decision based on the entire story;” or that “the Department’s arbitrary actions . . . created an incomplete picture, ultimately leading the district court to make its decision without being fully informed,” and that the district court based its decision to terminate “on a lack of information and full disclosure of the actual facts.” Opinion, ¶¶ 29, 41. Instead, a review of the record indicates that the district court was fully apprised of all pertinent facts from both parties. {78} The district court entered extensive findings of fact and conclusions of law on November 8, 2010, which was based on the following evidence. The relationship between Mother and Father began when Father was working at a homeless shelter in Albuquerque and Mother and her son were receiving services at the shelter. Concerned with Mother’s ability to care for her son, Father invited Mother and her son to live with Father and his wife (Wife). Father and Mother began a sexual relationship which resulted in the birth of Grace. After a short separation, Father and Wife moved to Texas. Mother moved to Texas and continued her relationship with Father. After Grace was born, Father and Wife assisted Mother with parenting Grace. Prior to Grace turning three months old, Father and Mother ended their relationship and in December 2006 Mother returned to Albuquerque to live with her parents who Father and Wife had previously met. Thereafter, Father never tried to communicate with Mother or Grace. Father moved to Oklahoma but Wife and their children did not go with him. While there, Father had minimal contact with Wife and no contact with Mother or Grace. In early 2007, Father and Wife moved back to Albuquerque and then during the summer they moved to Oklahoma and stayed there until September 2009. While they were in Oklahoma, Father and Mother attempted to stay in contact by email. No later than 2008, Father had numerous telephone conversations with Mother and at least one conversation with Grace, Father knew that Mother and Grace were living in Albuquerque. Father acknowledged that he did not look for Grace while he lived in Oklahoma because he had to take care of and provide for Wife and their four children. Father, Wife, and their children moved back to Albuquerque in September 2009. Father never tried to get an order for custody, time sharing, or provide child support for Grace. Prior to the filing of the motion for termination of parental rights, Father’s last contact with Mother was September 2009, when he lived in Oklahoma. Father knew that Mother had a history of being homeless yet never reported Grace missing nor contacted Grace ’ s grandparents to see if they might know where Grace was. Any relationship Father may have had with Grace had disintegrated. However, Grace’s guardian ad litem stated in her closing statement that Grace would benefit from knowing Father and asked the court not to terminate Father’s rights, to order visitation, and give Father an opportunity to raise Grace. The district court found that Father had failed to communicate with or provide support for Grace for a period longer than three months, the statutory period for abandonment specified in Section 32A-4-2(A), without justification. Having considered all of the evidence, the district court found it in Grace’s best interests to terminate Father’s rights pursuant to Section 32A-4-28(B)(l). {79} Father was afforded a second opportunity to convince the district court that his rights should not be terminated when the court granted his motion to reopen the termination proceedings and held a hearing on June 20, 2011. During this hearing, Mother testified that she had prevented contact between Grace and Father because Mother believed that Father wanted to rekindle their romantic relationship instead of reconnecting with Grace. Mother also testified that she never told Father that Grace had been taken into CYFD custody. Even the majority acknowledges that evidence of Father’s solid marriage, stable job, successful children, volunteer work, and love for Grace was presented at the termination hearing. See Opinion, ¶¶ 25-27. {80} The district court filed amended findings of fact and conclusions of law on August 31, 2011. The district court found that Father “stated he did little to look for his child . .. because he had to take care of and provide for [Wife] and their four children.” The court further found that Father made minimal efforts to locate or visit Grace, did not utilize any community resources in his search for Grace, and never paid any child support to Mother. Once again, the district court ruled that Father’s rights should be terminated pursuant to Section 32A-4-28(B)(l). {81} Based on the orders from the district court, it is apparent that the court considered all of the presented evidence before ruling. I also disagree with the majority that when CYFD filed an amended motion for termination of Father’s parental rights and incorrectly informed the district court that CYFD had not had any contact with Father that this “misconduct led the district court to decide the merits of this case based on half-truths rather than on Father’s actual ability to care for Child” as the majority suggests. Opinion, ¶ 21. While CYFD’s statements to the district court regarding Father’s communication prior to the first termination hearing were incorrect, it is clear that Father had ample opportunity to present his side, not only once, but twice. A review of the record indicates that the district court was fully apprised of all pertinent facts from both parties. And of the most important fact that Father had abandoned Grace. {82} In addition to disagreeing with the majority’s new rule that Subsection (B)(1) termination is prohibited when a parent reappears and seeks custody, I also am gravely concerned with the suggested remedy in this case. Not only is the remedy unclear, it delays permanency and stability for Grace. State ex rel. Children, Youth & Families Dep't v. Mafin M., 2003-NMSC-015, ¶ 24, 133 N.M. 827, 70 P.3d 1266 (explaining that “it is important for children to have permanency and stability in their lives, [so] termination proceedings should not continue indefinitely.”). “It is well established that parents do not have absolute rights to their children; rather, parental rights are secondary to the best interests and welfare of the children.” State ex rel. Children, Youth & Families Dep’t v. John R., 2009-NMCA-025, ¶ 27, 145 N.M. 636, 203 P.3d 167 (alteration, internal quotation marks, and citation omitted). {83} The majority holds that Father’s parental rights were improperly terminated under Subsection (B)(1) and as such reverses the termination of said rights. Opinion, ¶ 51. The majority then remands this case to district court with instructions to “conduct assessments of Father and [Grace],” and requires that “[a] bonding study of [Grace] in her foster home” be completed. Opinion, ¶ 52. The majority suggests that should the district court find that Grace remaining with her foster parents is in Grace’s best interests, Father could “relinquish his parental rights” and seek an ‘open adoption.’” Opinion, ¶ 53. {84} By reversing the termination of Father’s parental rights under Subsection (B)(1), the majority has reinstated Father’s fundamental right to parent Grace. Opinion, ¶ 52. However, Father is not afforded assistance and treatment to attempt to cure the condition of neglect (abandonment). The remedy is a remand to district court to determine whether “remaining in her foster home with Brother is ultimately in [Grace’s] best interests” and to hold an evidentiary hearing to determine the ultimate disposition of the case. Id. ¶ 53. What does disposition mean? How is the district court to determine the ultimate disposition of the case without adjudicating Father’s parental rights? {85} The remedy is based on the assumption that maintaining a relationship with Father is in the Grace’s best interests. There is nothing in the record to support that assumption. As of November 2011, Grace is doing very well with her pre-adoptive family. Grace wants to take the last name of her foster mother. An additional two years has now passed. Even by Father’s own account of the facts there is no indication that Grace ever knew her Father. There is also no basis for the determination that assessments of Father and Grace, a bonding study of Grace in her adoptive home, and limited supervised visits will provide the evidence that the court needs. While the majority raises concerns with the hearings before the district court, I have every confidence in the ability of the district court judge to determine what studies and what evidence is needed to make a decision whether remaining in her pre-adoptive home is in Grace’s best interests. {86} Also troubling is the direction given to the district court if there is a finding that remaining in her pre-adoptive home is in Grace’s best interests. The district court is told to allow Father to relinquish his parental rights on the condition that there be an “open adoption.” Not wanting to disrupt the adoption, the hope is that Father will relinquish his parental rights if there is an open adoption. Yet, as a result of this opinion, there is nothing to prohibit Father from asserting his fundamental right to parent Grace, refusing an open adoption, and filing for full custody, thus prolonging permanency for Grace. Father has maintained all along that he and Wife are capable of parenting both Grace and Brother full time. The fact that the majority suggests Father may relinquish his newly reacquired rights to parent Grace in favor of an “open adoption,” after Father has fought for years in the judiciary to regain said rights, is fantasy. See Opinion, ¶ 53. Further, the majority fails to consider the effect on Grace of Father parenting her full time and separating Grace from Brother. What happens if the Court finds that an open adoption is not in Grace’s best interests? What rights do the adoptive parents have? {87} Which factual scenario is likely to play out in this case is immaterial regarding the precedent set forth in this opinion. Rather, the factual problem is illustrative of the potential legal confusion that this opinion supports. IV. CONCLUSION {88} The Court of Appeals was correct in affirming the district court’s termination of Father’s parental rights pursuant to Section 32A-4-28(B)(l). Subsection (B)(1) is an independent ground for termination of rights in the statutory scheme and does not require that CYFD make reasonable efforts to reunite a child with his or her absent parent. There was no evidence of neglect and therefore CYFD’s decision to terminate Father’s parental rights under a sole theory of abandonment was not an abuse of discretion. The majority’s holding conflicts with the Children’s Code’s goal of permanency and the Legislature’s intent to protect children from absent parents. Thus, I would affirm the Court of Appeals and hold that the district court properly terminated Father’s rights. PETRA JIMENEZ MAES, Justice