This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**No. A-1-CA-38341**

**STATE OF NEW MEXICO ex rel.
CHILDREN, YOUTH & FAMILIES
DEPARTMENT,**

 Petitioner-Appellee,

v.

**HANNAH C.,**

 Respondent-Appellant,

and

**MATTHEW C.,**

 Respondent,

and

**AMANDA BACA-BALDONADO and
MATTHEW BALDONADO,**

 Intervenors,

**IN THE MATTER OF PIXIE ROSE C.,**

 Child.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY
Marie C. Ward, District Judge**

Children, Youth & Families Department
Rebecca J. Liggett, Chief Children's Court Attorney
Santa Fe, NM
Kelly P. O'Neill, Children's Court Attorney

Albuquerque, NM

for Appellee

Susan C. Baker
El Prado, NM

for Appellant

Richmond L. Neely
Albuquerque, NM

for Intervenors

Eleanor K. Bratton
Albuquerque, NM

Jill L. Marron
Albuquerque, NM

Guardian Ad Litem

## DECISION

**B. ZAMORA, Judge.**

**{1}** Hannah C. (Mother) appeals the termination of her parental rights to Child arguing that (1) the Children, Youth and Families Department (CYFD) failed to make reasonable efforts to assist Mother in ameliorating the causes and conditions which led to the neglect of Child; (2) CYFD failed to provide her with reasonable accommodations under the Americans with Disabilities Act (ADA); and (3) the district court's finding that Mother had presumptively abandoned Child is not supported by substantial evidence. We affirm.

## BACKGROUND

**{2}** On December 9, 2014, CYFD took custody of Child, who was approximately fourteen days old at the time. CYFD filed an abuse and neglect petition alleging that Child was abused and neglected as a result of Mother's inability "to discharge [her] responsibilities to and for [C]hild because of mental disorder or incapacity." At an adjudicatory hearing held in April 2015 Mother pled no contest to allegations that Child was a neglected child as defined by NMSA 1978, Section 32A-4-2(G)(2) (2009, amended 2018) (stating that a "neglected child" means a child "without proper parental care and control or subsistence, education, medical or other care or control necessary for the child's well-being because of the faults or habits of the child's parent"). The district court found that Child was a neglected child based on evidence that Mother's

"ongoing, unresolved mental health, substance abuse, domestic violence and parenting issues have negatively impacted her judgment and decision-making as it related to her ability to ensure [C]hild's safety and well-being."

**{3}** A few weeks later, at a dispositional hearing, the district court adopted a treatment plan proposed by CYFD, which set forth "services and steps to promote improved conditions in the home and facilitate reunification." Pursuant to the treatment plan, the district court ordered Mother to (1) "participate in a psychosocial assessment and follow recommendations"; (2) complete a "psychological assessment and follow recommendations"; (3) **"**participate in a domestic violence assessment and follow recommendations"; (4) "sign releases of information [to] obtain pertinent records"; and (5) maintain contact with CYFD and attend visitation with Child. Following implementation of the treatment plan, the district court held six permanency hearings to track Mother's compliance with the plan. Initially, Mother was fairly compliant with the terms set by the district court, but as the months progressed, her adherence to the plan waned.

**{4}** On November 20, 2017, following the last of the six permanency hearings, CYFD moved to terminate Mother's parental rights on the basis that Mother had failed to comply with the treatment plan. Specifically, CYFD alleged that Mother had failed to accept responsibility for the causes and conditions that brought Child into custody; failed to adequately address mental health issues impairing her parenting abilities; and failed to recognize and adequately address ongoing safety risks to Child.

**{5}** Over the course of a five-day termination of parental rights (TPR) hearing, CYFD presented testimony from three of its employees as well as multiple mental health providers detailing their work with Mother during the case and outlining the evidence in support of their request to terminate. The district court entered the following findings of fact and conclusions of law relevant to our analysis:

> 9. [CYFD] provided referrals for the services required under the treatment plan. During the course of the case, [Mother] participated in several services. She completed her psychosocial and psychological evaluation. She attempted services with Juntos Podemos and Aliviar to address domestic violence concerns. [Mother] also reported seeing a psychiatrist ever[y] few months, but did not engage in individual mental health counseling or services.

> 10. The family was referred to A Child's Voice for therapeutic supports to address bonding, therapeutic visits and parenting. The family was referred to [the University of New Mexico Hospital] Infant Mental Health Program for additional support. [Mother] participated in these services[;]

> . . . .

66.    Attempts were made at visits to focus on Mother and [C]hild. In March 2016 a visit had been scheduled. However upon arrival at the facility [C]hild became extremely dysregulated in the parking lot. [C]hild was observed in the parking lot. The foster parents were not even able to get [C]hild into the building and she could not be consoled. [Mother] had also been late to that visit. [C]hild was so dysregulated there was a serious concern for her health and well-being, and therefore the foster parents were directed to leave with [C]hild[;]

67.    Ms. [Stacy] Bond then met with [Mother] when she arrived to explain what occurred and her concern. [Mother] then began to make threats toward CYFD, herself, and made assertions of suicide by cop. An ambulance was called and she was transported to the hospital. After [Mother's] release [from the hospital,] Ms. Bond wanted to meet with [Mother] to develop a safety plan but [Mother] refused to meet[;]

. . . .

74.    Although extensive efforts were made for frequent regular therapeutic visits between [C]hild and [Mother], and supportive services for [Mother] to improve opportunity for success, over time the interactions between [C]hild and [Mother] became worse, causing concern for [C]hild's well-being and [the visits] were stopped[;]

75.    After the hospitalization after the March 2016 visit, Ms. Bond and other therapists made attempts to meet with [Mother] and address concerns. However, the efforts were not successful, and once again [Mother] made threats and the agency [A Child's Voice] felt they could no longer safely work with her in providing services[;]

. . . .

112.    [Mother] never provided release for medical records to address her physical challenges during the course of this case[;]

. . . .

114.    At this time, [CYFD] cannot return [C]hild home, and does not believe the same is possible in the near future. There has been no movement or confirmation regarding [Mother]'s efforts to work on the treatment plan items including individual supports for mental health issues. Moreover, the lack of confirmation of recommended services for the parents has precluded consideration to work on further therapeutic visits[;]

115.    [N]o progress [has been] made toward restoring therapeutic visits. [Mother's] lack of communication and meeting home visit

requirements also precluded full assessment of [Mother's] progress regarding safe living conditions and parenting.

**{6}** Based on its findings of fact, the district court concluded that CYFD proved by clear and convincing evidence that (1) Child was abused and neglected; and (2) the "causes and conditions of the neglect have not been alleviated and are unlikely to change in the foreseeable future despite the reasonable efforts of [CYFD.]" The district court concluded that termination of Mother's parental rights "will promote the physical, mental, and emotional welfare and needs of [C]hild." As a result, the district court entered judgment terminating Mother's parental rights to Child. This appeal followed.

## DISCUSSION

**{7}** Parental rights may be terminated based upon a finding of neglect when "the conditions of the neglect are unlikely to change in the foreseeable future despite reasonable efforts by the department . . . to assist the parent in adjusting the conditions that render the parent unable to properly care for the child." NMSA 1978, § 32A-4-28(B)(2) (2005). CYFD must prove the "grounds for termination by clear and convincing evidence." *State ex. rel. Children, Youth & Families Dep't v. Tammy S.*, 1999-NMCA-009, ¶ 13, 126 N.M. 664, 974 P.2d 158. "Clear and convincing evidence means evidence that instantly tilts the scales in the affirmative when weighed against the evidence in opposition and the fact[-]finder's mind is left with an abiding conviction that the evidence is true." *State ex rel. Children, Youth & Families Dep't v. Keon H.*, 2018-NMSC-033, ¶ 37, 421 P.3d 814 (internal quotation marks and citation omitted). We view "the evidence in the light most favorable to the [TPR] judgment" and "will evaluate whether the [district] court could have found by clear and convincing evidence the necessary statutory conditions to termination." *State ex rel. Children, Youth & Families Dep't v. Patricia H.*, 2002-NMCA-061, ¶ 22, 132 N.M. 299, 47 P.3d 859. We will uphold the district court's judgment terminating parental rights if it is supported by substantial evidence. *See id.* "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support a conclusion." *Id.* (internal quotation marks and citation omitted).

## I.	CYFD Made Reasonable Efforts to Assist Mother

**{8}** Mother contends that substantial evidence does not support the district court's conclusion that CYFD made reasonable efforts to assist Mother in ameliorating the causes and conditions which led to the neglect of Child. Specifically, Mother argues that CYFD failed to provide "services to assist" her and "fail[ed] to provide Mother with initial and prolonged visits" with Child. We disagree.

**{9}** The law requires CYFD to take affirmative steps to address and correct deficiencies affecting parent-child relationships before moving to terminate parental rights. *See* NMSA 1978, § 32A-4-22(C) (2009, amended 2016) ("Reasonable efforts shall be made to preserve and reunify the family, with the paramount concern being the child's health and safety."). The reasonableness of CYFD's efforts depend on the totality

of the circumstances. *See Keon H.*, 2018-NMSC-033, ¶ 41. "What constitutes reasonable efforts may vary with a number of factors, such as the level of cooperation demonstrated by the parent and the recalcitrance of the problems that render the parent unable to provide adequate parenting." *Patricia H.*, 2002-NMCA-061, ¶ 23. In addition, the law requires CYFD to provide parents with "reasonable rights of visitation." Section 32A-4-22(D) ("Any parent . . . of a child who is placed in the legal custody of the department . . . shall have reasonable rights of visitation with the child as determined by the court, unless the court finds that the best interests of the child preclude any visitation.").

**{10}** Having carefully reviewed the record, we conclude that substantial evidence supports the district court's conclusion that CYFD made reasonable efforts with respect to both the provision of services and visitation as required by Section 32A-4-22(C) and (D). Those efforts can be divided into three categories. First, CYFD provided Mother with referrals or direct access to basic services. The various Permanency Planning Workers (PPWs) assigned to Mother's case referred Mother to food pantries and soup kitchens, provided her with bus passes, budgeting guides, and guides on maintaining a clean home.

**{11}** Second, CYFD referred Mother to various counseling agencies, and it referred her for a psychological evaluation and other treatment services. Taylor Boyd, the PPW initially assigned to work with Mother referred her to Aliviar Counseling Services, Inc., for individual counseling and domestic violence counseling. Boyd also referred Mother to Dr. Christopher Alexander, a clinical psychologist, for a neuropsychological evaluation. Based on the neuropsychological evaluation, Dr. Alexander recommended that Mother (1) sign a release for mental health records; (2) attend a partners of sex offenders program; (3) receive care from a psychiatrist; (4) attend a domestic violence program; (5) attend supervised visitations with Child; (6) obtain stable housing; and (7) follow through with all medical appointments. Importantly, CYFD made active efforts to refer Mother to additional counseling and mental health treatment services based upon Dr. Alexander's recommendations, and upon evolving conditions which became evident during the course of Mother's participation in the treatment plan. Ultimately, Mother was referred to the University of New Mexico's Infant and Early Childhood Mental Health program to work with Dr. Seema Jacob, an expert in child psychology.

**{12}** Finally, CYFD made reasonable efforts to ensure continued visitation between Mother and Child. Early in the case, when Child was only a few months old, PPW Boyd scheduled the initial parent-child visit between Mother and Child. PPW Boyd testified that during that visit, Child became "dysregulated" and was "screaming." Due to Child's dysregulation at the initial visit, Boyd referred Mother to A Child's Voice, a counseling agency with specialized expertise in parenting and child bonding. Tina Bond, a licensed Clinical Social Worker at A Child's Voice, testified that Child appeared distressed during the visits with Mother, and engaged in dysregulated behaviors including hair pulling, crying, and failing to make eye contact. Due to Child's distress, the parent-child visits were shortened. Beginning in January 2016 Child's foster parents attended the visits, which led Child to be more receptive to Mother. However, when the foster parents were

no longer allowed to attend the visits in February 2016 Child's distress returned, and was worse than before.

**{13}**  The visitation issues came to a head in March 2016. During a scheduled parent-child visit, Child exhibited signs of distress, "couldn't catch her breath," and was "red-faced." Due to Child's distress, A Child's Voice ended the visit and sent Child home with the foster mother. After Child went home, Mother said "she was going to hurt CYFD . . . [and] she was going to kill herself." The parent-child sessions were suspended as a result of Mother's threats of self-harm and harm to others, but representatives of A Child's Voice met with Mother in an attempt to implement a safety plan in order to reestablish the parent-child visits. Mother did not engage in the safety plan and consequently, the parent-child visits were not reinstated.

**{14}**  The record reflects that despite CYFD's efforts to connect Mother with the services necessary to facilitate her completion of the treatment plan, Mother did not follow through with her responsibilities to attend and document her progress with the treatment plan's requirements. All three CYFD employees testified that Mother did not adequately progress toward or complete her treatment goals. PPW Boyd testified that while Mother "did attend" the domestic violence course through Aliviar Counseling Services, she "did not complete" it. Similarly, PPW Julia Draper testified that when she was assigned to the case in June 2017, Mother was not attending domestic violence counseling. Both PPW Elizabeth Bearzi and PPW Draper testified that Mother failed to make progress in addressing her mental health needs. Finally, although Mother informed PPW Draper that she was receiving mental health and psychiatric care from the University of New Mexico's COPE clinic (a psychological treatment facility), Mother failed to provide documented proof of her participation in such services, and failed to sign a records release allowing CYFD access to such documentation as required by the court-ordered treatment plan. Based on our review of the record, Mother was continually resistant to CYFD's efforts to get her to complete and document her treatment. In lieu of participating in the various counseling and treatment services to which she was referred, Mother maintained, "I get my needs addressed there [COPE Clinic]. I don't need to do anything additional." The evidence adduced from CYFD employees and Mother's own statements support the conclusion of the district court that the "causes and conditions of the neglect have not been alleviated and are unlikely to change in the foreseeable future despite the reasonable efforts of [CYFD]."

**{15}**  The testimony of witnesses from outside of CYFD also demonstrate that Mother failed to adhere to the treatment plan and to acknowledge her parental deficiencies and take steps to address them. For instance, while Mother did attend six psychological evaluation and treatment sessions through the University of New Mexico's Infant and Early Childhood Mental Health, Dr. Jacob ultimately concluded that Mother "did not take any kind of responsibility or accountability as to why [Child] was in the state's custody." Dr. Jacob testified that Mother "was not able to think about how [her mental health] conditions impacted her ability to take care of herself" and Child. Finally, Dr. Jacob concluded that Mother was unable to recognize risks posing safety concerns to the Child. Similarly, Dr. Alexander opined that "nothing would prohibit [Mother] from

attending [individual] counseling in terms of her physical functioning, her mobility, [and] cognitive capabilities"; but "the difficulty is and probably has been motivational."

{16}    Both CYFD and Mother were required to make efforts to reunify the family. *See Keon H.*, 2018-NMSC-033, ¶ 48 (holding that the father failed to make reasonable efforts because he did not contact CYFD, missed appointments, and rarely visited the child). In *Keon H.*, CYFD "prepared a treatment plan for [the f]ather, went over the treatment plan with [him], provided [the f]ather with [CYFD]'s contact information, and scheduled appointments for [the f]ather's psychosocial assessment[, but he] did not show up for the appointments and did not participate in the psychosocial assessment." *Id.* ¶ 43. Similarly, here, Mother failed to complete the various requirements outlined in the court-ordered treatment plan despite CYFD's efforts to connect her with appropriate services. *See id.* ¶ 41 ("Efforts to assist a parent may include individual, group, and family counseling, substance abuse treatment, mental health services, transportation, child care, and other therapeutic services." (internal quotation marks and citation omitted)).

{17}    With respect to Mother's claim that CYFD failed to provide appropriate visitation between Mother and Child, it was Mother's threats of self-harm and harm to CYFD employees that resulted in the end of such visits. CYFD's request that Mother participate in the development of a safety plan before resuming such visits was not unreasonable. In light of the district court's statutory duty to consider Child's "health and safety," we conclude that CYFD's suspension of the parent-child visits following Mother's refusal to participate in a safety plan was appropriate. *See* § 32A-4-22(C) (stating that "[r]easonable efforts shall be made to preserve and reunify the family, with the paramount concern being the child's health and safety"). "[V]iewing the evidence in the light most favorable to the [judgment]," *Keon H.*, 2018-NMSC-033, ¶ 38, we affirm the district court's termination of Mother's parental rights to Child, pursuant to Section 32A-4-28(B)(2). Given our holding, we need not address whether the district court properly terminated Mother's parental rights under Section 32A-4-28(B)(3)(f) (explaining presumptive abandonment).

## II.    Reasonable Accommodations under the ADA

{18}    We turn now to Mother's contention that CYFD failed to comply with the ADA by (1) failing to make a determination as to whether she was a "qualified [individual] with a disability[,]" and (2) failing to provide "reasonable accommodations" to aid her with the potential disability. We disagree.

{19}    To establish a violation of the ADA, the burden was on Mother to "establish[] that she was a qualified individual with a disability." *State ex rel. Children, Youth & Families Dep't v. John D.*, 1997-NMCA-019, ¶ 21, 123 N.M. 114, 934 P.2d 308. Contrary to Mother's argument on appeal, the district court did address whether Mother carried her burden; it concluded that she did not.

**{20}**    Substantial evidence supports that conclusion. During the termination proceedings, Mother's trial counsel argued that due to Mother's well-documented disabilities Mother was entitled to reasonable accommodations under the ADA. However, Mother never presented evidence in support of this argument. *See Muse v. Muse*, 2009-NMCA-003, ¶ 51, 145 N.M. 451, 200 P.3d 104 ("The mere assertions and arguments of counsel are not evidence."). And on appeal, Mother fails to direct our attention to any evidence supporting her contention that she satisfied the requirements necessary for a finding that she is a "qualified individual with a disability" under the ADA. *See State ex rel. Children, Youth & Families Dep't v. Johnny S. Sr.*, 2009-NMCA-032, ¶ 8, 145 N.M. 754, 204 P.3d 769 ("[T]he parent must create a factual and legal record sufficient to allow meaningful appellate review[.]"). Because Mother did not establish that she is a qualified individual with a disability for whom the ADA requires reasonable accommodations, we need not determine whether CYFD complied with the ADA.

**{21}**    We also note that Mother did not present her reasonable accommodations argument until nearly four years after CYFD took Child into custody. *See id.* ¶ 9 ("[T]he initial burden to raise and argue the issues—as early in the case as possible—lies with the parents and their counsel."). This extreme delay deprived CYFD of a meaningful opportunity to make any additional accommodations that the ADA might have required.

**CONCLUSION**

**{22}**    For the foregoing reasons, we affirm the district's termination of Mother's parental rights to Child.

**{23}    IT IS SO ORDERED.**

**BRIANA H. ZAMORA, Judge**

**WE CONCUR:**

**JENNIFER L. ATTREP, Judge**

**ZACHARY A. IVES, Judge**