IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: March 13, 2009

Docket No. 28,790


STATE OF NEW MEXICO ex rel.
CHILDREN, YOUTH AND FAMILIES
DEPARTMENT,

      Petitioner-Appellee,

v.

BENJAMIN O.,

      Respondent-Appellant,

and

In The Matter of LAKOTA C., a Child.

APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY
Monica Zamora, District Judge

New Mexico Children, Youth
  and Families Department
Simon Romo, Chief Children's Court Attorney
Rebecca J. Liggett, Children's Court Attorney
Santa Fe, NM

for Appellee

Lopez & Sakura, L.L.P.
Julie A. Sakura
Santa Fe, NM

for Appellant

OPINION

1

**CASTILLO, Judge.**

**{1}**     This is the third in a series of appeals dealing with Father's parental rights to his daughter.  Father's arguments on appeal fall into two categories.  First, he asserts that the Children, Youth, and Families Department (CYFD) failed to prove abandonment by clear and convincing evidence.  Second, Father contends that the district court failed to comply with the procedure outlined by this Court in its last opinion on this matter, *State ex rel. Children, Youth & Families Dep't. v. Benjamin O.* (*Benjamin O. 2007*), 2007-NMCA-070, 141 N.M. 692, 160 P.3d 601.  We hold that CYFD proved by clear and convincing evidence that Father abandoned Child and, further, that the district court followed our direction in *Benjamin O. 2007*.  Accordingly, we affirm the district court's judgment terminating Father's parental rights.

## I.     BACKGROUND

**{2}**     This case has an extensive history, both with the district court and this Court.  The two previous opinions filed by this Court have presented this history in detail.  *See Benjamin O. 2007*, 2007-NMCA-070, ¶¶ 2-22; *State ex rel. Children, Youth & Families Dep't v. Shawna C.*, 2005-NMCA-066, ¶¶ 2-6, 137 N.M. 687, 114 P.3d 367.  We nevertheless begin with an overview of the procedural background of the case in order to place the current appeal in the context of past proceedings.

**{3}**     In August 2003, CYFD filed an abuse and neglect petition against Father and Mother, and Child was taken into CYFD custody.  The district court adjudicated Child to be abused or neglected as to both parents and ordered CYFD to implement a treatment plan.  Both parents appealed that judgment.  In the meantime, the matter proceeded, and the district court held the initial judicial review.

**{4}**     As of July 2004, CYFD was still working toward reunification, but in October 2004, the district court approved CYFD's change of plan to termination of parental rights and adoption.  The change in plan was followed by a motion for termination of the parental rights of both parents.  Father responded to the motion and argued that CYFD did not make reasonable efforts to assist him to change the circumstances that led to the abuse or neglect.  During the termination of parental rights trial, this Court issued its opinion in *Shawna C.*, which affirmed the adjudication of abuse or neglect as to Mother but reversed the adjudication as to Father.  2005-NMCA-066, ¶ 1.

**{5}**     After *Shawna C.* reversed the adjudication of abuse or neglect, in May 2005 CYFD filed a motion for temporary custody of Child to allow further investigation, the reopening of the trial, and amendment of the motion for termination of parental rights.  In June 2005, CYFD filed supplemental allegations (2005 supplemental allegations) against Father.  The district court held a hearing and ordered that CYFD continue to implement the treatment plan and that Child remain in CYFD custody.  Soon after this order, in September 2005 Child moved to Georgia to live with Father's sister (Aunt).

**{6}** Six months after the filing of *Shawna C.* in November 2005, the trial for the termination of parental rights continued. CYFD reported to the district court that Father had not been in contact with Child since the previous July. In its proposed findings of facts and conclusions of law, CYFD stated that "[a]fter July[] 2005, [Father] ceased any contact with CYFD, ceased his visitation with [C]hild, ceased any efforts to maintain adequate housing for [C]hild and ceased any efforts to demonstrate the stability needed to care for [C]hild." In addition, CYFD argued that it would be futile to make further efforts.

**{7}** On February 15, 2006, the district court entered an order terminating the parental rights of both parents. Father appealed the judgment; Mother did not. In April 2007, this Court filed *Benjamin O. 2007* and reversed the district court's termination of Father's parental rights. 2007-NMCA-070, ¶ 33. The case was remanded to the district court "to determine whether CYFD's efforts with respect to Father's housing and employment issues were reasonable, to determine whether CYFD made any efforts after the adjudication was reversed to facilitate any sort of reunification between Father and Child, and to make additional findings as necessary to comply with the procedure outlined" in the opinion. *Id.* ¶ 48.

**{8}** In July 2007, the district court issued an order addressing the mandate from this Court. The order required (1) that if CYFD chose to pursue termination against Father, it was to file a motion for retrial on the amended motion for termination of parental rights; (2) that if the district court did not find clear and convincing evidence of neglect by Father, CYFD should expedite the transition of Child to Father; and (3) that a permanency hearing be held within 30 days. CYFD filed a request for a retrial and a permanency hearing. Although CYFD presented the district court with an interim permanency hearing report dated August 1, 2007, the permanency hearing was not held until February 12, 2008.

**{9}** Before an order was filed based on the February 12 permanency hearing, CYFD filed a motion for leave to amend its earlier motion for the termination of Father's parental rights and indicated that it would include allegations of abandonment. The district court granted CYFD's motion to amend. In addition, the district court entered a permanency order and approved CYFD's February 12 treatment plan, which designated "adoption" as the permanency plan for Child.

**{10}** On April 2, 2008, CYFD filed the amended motion for the termination of Father's parental rights. The motion realleged the original allegations and the 2005 supplemental allegations. The motion also included new allegations of abandonment or presumptive abandonment. A trial was held from April 14 through April 16. The district court received written closing arguments from the parties and, thereafter, on May 27, 2008, entered judgment terminating Father's parental rights. In support of the judgment, the district court also entered extensive findings of fact and conclusions of law, which we will review throughout our analysis. Father appeals the judgment. With this procedural history as background, we turn to Father's arguments on appeal.

3

## II. DISCUSSION

**{11}** We reorganize Father's contentions for the purposes of discussion. As a preliminary matter, we address the standard of review—an issue disputed by the parties. We then turn to Father's argument that he did not abandon Child within the meaning of "abandonment" under NMSA 1978, Section 32A-4-2(A) (1999). We conclude by directing our attention to Father's assertion that the requirements of *Benjamin O. 2007* were not followed by the district court in the final termination proceedings.

### A. Standard of Review

**{12}** There is no dispute that *Benjamin O. 2007* required the district court to make a series of findings by clear and convincing evidence. 2007-NMCA-070, ¶¶ 42-43. "For evidence to be clear and convincing, it must instantly tilt the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true." *State ex rel. Children, Youth & Families Dep't v. Hector C.*, 2008-NMCA-079, ¶ 11, 144 N.M. 222, 185 P.3d 1072 (internal quotation marks and citation omitted). "We will uphold the district court's judgment if, viewing the evidence in the light most favorable to the judgment, a fact finder could properly determine that the clear and convincing standard was met." *Id.* (internal quotation marks and citation omitted).

**{13}** Father contends that whether he abandoned Child requires de novo interpretation of the statute. CYFD counters that Father's arguments "are all directed to factual determinations by the [district court] pursuant to an already established legal standard." Thus, CYFD's position is that we should review the district court's findings of fact that support the conclusion of abandonment for substantial evidence. We agree with CYFD.

**{14}** The parties do not disagree about the legal standard for abandonment, and the core of this issue is whether CYFD provided clear and convincing evidence to establish that Father abandoned Child. Accordingly, we review the district court's conclusion that Father abandoned Child in order to determine if it was supported by evidence sufficient to meet the clear and convincing standard. *See id.*

### B. Abandonment

**{15}** Section 32A-4-2(A)(2)(a) defines "abandonment" as "instances when the parent, without justifiable cause . . . left the child with others, including the other parent or an agency, without provision for support and without communication for a period of . . . three months if the child was under six years of age at the commencement of the three-month period." In the alternative, CYFD can raise a rebuttable presumption of abandonment by first showing that a parent has placed his child in the care of others and then by establishing the following six additional criteria:

> (a)     the child has lived in the home of others for an

4

extended period of time;

(b) the parent-child relationship has disintegrated;

(c) a psychological parent-child relationship has developed between the substitute family and the child;

(d) if the court deems the child of sufficient capacity to express a preference, the child no longer prefers to live with the natural parent;

(e) the substitute family desires to adopt the child; and

(f) a presumption of abandonment created by the conditions described in Subparagraphs (a) through (e) of this paragraph has not been rebutted.

NMSA 1978, § 32A-4-28(B)(3)(a)-(f) (2005); § 32A-4-28(C). The district court found (1) that Child was abandoned under Section 32A-4-2(A) and (2) that Father failed to rebut the presumption of abandonment. Because we conclude that Father failed to rebut the presumption of abandonment raised under Section 32A-4-28(B), we need not address whether Father abandoned Child under Section 32A-4-2(A).

**{16}** Father focuses on the second of the six additional criteria—the disintegration of the parent-child relationship. He relies on *State ex rel. Children, Youth and Families Department v. Joe R.*, 1997-NMSC-038, ¶ 14, 123 N.M. 711, 945 P.2d 76, and he argues that CYFD was required to establish two factors: (1) parental conduct evidencing a conscious disregard of obligations owed to the child, and (2) this conduct must lead to the disintegration of the parent-child relationship. Father asserts that CYFD failed to prove that he displayed a conscious disregard for Child's welfare and that his conduct did not lead to the disintegration of the parent-child bond. We disagree.

**{17}** Specifically, Father contends that he consistently demonstrated his concern for Child's welfare by (1) contacting CYFD when he thought Child was not being properly cared for, (2) traveling to Georgia to visit Child, (3) contacting CYFD when Aunt was not facilitating the phone calls, (4) contacting CYFD in December 2007, and (5) sending packages to Child in March 2008. To the contrary, Father claims that CYFD's actions led to the disintegration of the parent-child bond because CYFD hung up on him in December 2007 and failed to arrange visits—by telephone or in person—after November 2007.

**{18}** We fail to see how CYFD's impolite end to the December 2007 conversation led to the disintegration of the parent-child bond. CYFD had arranged for calls to Child at Aunt's home. When Father complained in October 2007 that Aunt wasn't answering the phone and when his comments to Child became inappropriate, CYFD set up standing supervised calls to Child at her therapist's office. After a few failed attempts to reach Child at the therapist's office, Father stopped trying. When Child changed therapists in December 2007, Father had already stopped participating in the calls. As a result, when the second therapist recommended against interjecting Father into Child's therapy, CYFD did not arrange for

5

calls at that location. CYFD did not reinstate the calls to Aunt's home because Father had indicated that such an arrangement was a problem for him.

**{19}** Regarding his contact with CYFD, the district court found that Father generally made contact when he was dissatisfied. In addition, although Father testified that he called CYFD numerous times, his social worker testified that it was possible that he had called but that he did not leave messages for her. Such communications—constant calls without messages—are not evidence that Father was communicating with CYFD in order to further Child's interests.

**{20}** Considering only actions that took place after the reversal of the first termination proceedings in *Benjamin O. 2007*, we conclude that there was ample evidence that Father consciously disregarded his obligation to Child. Almost immediately after *Benjamin O. 2007*, CYFD arranged a visit between Father and Child. CYFD received word, however, that Father would be unable to visit at the appointed time because he was incarcerated in Colorado. Child moved to Georgia to live with Aunt before Father was able to travel to Albuquerque. After his release in June 2007, Father came to New Mexico. Father and the social worker discussed plans for visitation and for telephone contact, and the telephone contact began almost immediately. Father told CYFD that he would not be remaining in Albuquerque and by July, Father had returned to Denver.

**{21}** CYFD attempted to set up a home visit with Father in Denver. Father refused the visit, saying that he was leaving that day for Georgia. After that, CYFD tried to contact Father in Georgia so that he could visit Child at her therapist's office, and the social worker also researched the possibility of placing Child with Father at the homeless shelter where he appeared to be living. The social worker sent letters to the homeless shelter and to the three addresses that she had for him. The next time Father contacted CYFD, he had returned to Colorado. He told the social worker that he did not want to live in Georgia.

**{22}** The phone calls between Father and Child continued, sporadically, during this time. Beginning in October, the calls were routed through Child's therapist. The first two calls to the therapist's office were unsuccessful. Father's phone had been stolen at the time of the first call, and he called at the wrong time for the second. After that, Father did not try to call the office again. Father's next attempt to interact with Child occurred in March 2008, when he sent packages to her through CYFD. As a result, Father had no contact with Child for a period of five months.

**{23}** Despite the available means of contact, such as letters and packages, Father does not explain the extended period between October and March in which he entirely failed to communicate with Child. Consequently, we hold that CYFD presented clear and convincing evidence that Father consciously disregarded his obligations to Child and that, as a result, the parent-child relationship disintegrated.

**C.** *Benjamin O. 2007*

6

**{24}** After the reversal of Father's adjudication in *Shawna C.*, CYFD maintained custody of Child and ultimately pursued termination proceedings against Father by means of the 2005 supplemental allegations of abuse and neglect. When those proceedings culminated in the termination of Father's parental rights, Father appealed. That appeal resulted in *Benjamin O. 2007* and, in that opinion, this Court took the opportunity to "clarify the procedure that should be followed after a reversal of an adjudication of abuse and neglect on these grounds." 2007-NMCA-070, ¶ 1. Because the district court's order did not contain sufficient findings to determine if the necessary procedure had been followed, this Court reversed the termination of Father's parental rights and remanded the case to the district court with instructions to make specific findings. *Id.* ¶¶ 1, 48.

**{25}** Father argues that the district court failed to find by clear and convincing evidence that: (1) Father's current actions caused abuse, neglect, or abandonment; (2) CYFD failed to implement a transition plan in order to return Child to Father; and (3) CYFD's own actions did not contribute to the new or current allegations. *See id.* ¶¶ 44, 47-48. We begin with the evidence concerning Father's current actions.

1.    **Current Actions**

**{26}** Despite reversal of the termination of Father's parental rights in *Benjamin O. 2007*, we did not foreclose the possibility of subsequent proceedings to terminate Father's rights. *Id.* ¶ 39. *Benjamin O. 2007* made it clear that if reunification was not in Child's best interests, CYFD could, without filing a new petition, "bring new or current allegations of abuse, neglect, or abandonment to the district court's attention." *Id.* This Court acknowledged that CYFD filed the 2005 supplemental allegations in that regard, and this Court indicated that such allegations would be sufficient if they were based on current allegations of abuse or neglect and supported by the requisite evidence. *Id.* We understand "new or current allegations" to refer to allegations based on facts that occurred after the reversal in *Benjamin O. 2007*—facts that would support a conclusion that reunification is not possible and termination of parental rights is in Child's best interest. *See id.* If the 2005 supplemental allegations were supported by the evidence, *Benjamin O. 2007* directs the district court to implement a treatment plan in accordance with the statute and proceed according to the Child Abuse and Neglect Act (Act), NMSA 1978, Sections 32A-4-1 to -34 (1993, as amended through 2005). *See Benjamin O. 2007*, 2007-NMCA-070, ¶ 44.

**{27}** The record shows that on February 13, 2008, the evidence presented at the first permanency hearing after *Benjamin O. 2007* related to the 2005 supplemental allegations of abuse or neglect. On March 7, 2008, however, CYFD requested leave to amend its motion for the termination of Father's parental rights so that new allegations—those related to abandonment—could be included. The district court granted the motion and, on April 2, 2008, the pending motion for termination was amended to include the new allegations. The order terminating Father's rights relies on theories of neglect and abandonment.

**{28}** Father contends that the district court failed, until the termination hearing, to take

evidence on the 2005 supplemental allegations in order to determine whether they were supported by clear and convincing evidence and that, by the time of the hearing, it was too late to implement a treatment plan that would help Father to overcome the causes and conditions of neglect. In addition, Father argues that *Benjamin O. 2007* contemplated that CYFD would bring current allegations of abuse, neglect, or abandonment in a proceeding separate from and prior to the termination of parental rights. Because we conclude that the district court followed the correct procedure to terminate Father's rights based on a current theory of abandonment, we do not address the sufficiency of the 2005 supplemental allegations, which were continued allegations of abuse and neglect.

**{29}** *Benjamin O. 2007* considered only the allegations that were before this Court. The opinion carefully outlines the requirements for CYFD to bring allegations of abuse and neglect under any circumstances. *See id.* ¶¶ 43-45. This Court went on to state that "[i]f CYFD decides to pursue termination of Father's parental rights, such rights may only be terminated based on clear and convincing evidence of all of the usual elements required for termination." *Id.* ¶¶ 41, 46. Although this Court required clear and convincing evidence that Father's current actions "constitute abuse, neglect, or abandonment," *id.* ¶ 41, *Benjamin O. 2007* does not address the procedure to pursue allegations of abandonment, but instead required "compliance with the provisions of the Act" as the "only way to ensure that Father's rights as a parent" were adequately protected. *Id.* ¶ 45. We thus turn to the Act, rather than the dictates of *Benjamin O. 2007* in order to determine what procedures are required to terminate parental rights based on abandonment. *See id.* ¶ 24 ("Because our analysis requires interpretation of the [Act], our review is de novo.").

**{30}** To address Father's argument that a treatment plan and a separate hearing were required, we must compare the procedures for the different bases for termination. Termination based on abuse or neglect requires the implementation of a treatment plan. "If a child is found to be neglected or abused, in its dispositional judgment the court shall also order the department to implement and the child's parent, guardian or custodian to cooperate with any treatment plan approved by the court." Section 32A-4-22(C). After a treatment plan is adopted, the court conducts periodic reviews of the progress of the parties. *See* § 32A-4-25(B). Termination of parental rights may occur only if the court finds that the causes and conditions of neglect are unlikely to change despite reasonable efforts by CYFD to assist the parent or if there is "a clear showing that the efforts [to assist the parent] would be futile." Section 32A-4-28(B)(2)(a). Like *Benjamin O. 2007*, these provisions are silent as to the procedure for allegations of abandonment. *See State ex rel. Children, Youth & Families Dep't v. John D.*, 1997-NMCA-019, ¶¶ 11-12, 123 N.M. 114, 934 P.2d 308 (distinguishing between the requirements for termination under Section 32A-4-28(B)(2), neglect, and Section 32A-4-28(B)(3), abandonment).

**{31}** Instead, Section 32A-4-28(B)(1) simply says that the court shall terminate parental rights with respect to a child when "there has been an abandonment of the child by his parents." There is no indication that the parent who has abandoned the child must receive services or benefit from a treatment plan. *See* § 32A-4-22(C) (requiring a treatment plan

8

when a child "is found to be neglected or abused"). Instead, the statute simply requires a finding that the child has been abandoned. Although CYFD did not file the additional allegations of abandonment until April 2, 2008, and the termination proceedings began on April 14, 2008, there was no objection made to the inclusion of additional grounds for termination. Father did not object to the procedure employed, and the Act does not require more.

**{32}**     In addition, review of the amended motion to terminate parental rights demonstrates that CYFD's allegations of abandonment were current—that they were sufficiently based on Father's activities after the second reversal in *Benjamin O. 2007*. The amended motion states that Father "has not maintained contact with [Child] in any meaningful way since [CYFD] re-initiated contact with him." We have already determined that these allegations were proven by clear and convincing evidence, and we are further satisfied that the district court properly considered the allegations of abandonment and that those allegations were based on Father's current actions.

## 2.      Transition Plan

**{33}**     In *Benjamin O. 2007*, we directed the district court and CYFD to "actually put a transition plan in place in order to attempt to return Child to Father," and we explained that CYFD must actually comply with the district court's orders to investigate whether Father could regain custody of Child and to assist Father with his housing issues. 2007-NMCA-070, ¶ 38. Father contends that CYFD failed to implement a transition plan to accomplish those goals. The district court concluded that "CYFD made reasonable efforts to facilitate the reunification of [Father] with [Child] after the adjudication was reversed to the [t]ermination of [p]arental [r]ights trial." In addition, the district court concluded that CYFD made reasonable efforts to help Father obtain housing. The record supports the trial court's conclusions.

**{34}**     The district court heard testimony that after the filing of our opinion in both *Shawna C.* and *Benjamin O. 2007*, CYFD considered reunification. Father's social worker—the one assigned to Father's case after the reversal in 2005 of Father's adjudication in *Shawna C.*—testified to the following: Father knew that the plan was reunification and knew that proof of housing and a home visit was necessary in order for him to reunify with Child. Despite this knowledge, Father refused to allow a home visit or to provide an address. Around the same time, Father lost his apartment. Although CYFD would have helped Father find acceptable living arrangements, in July 2005 Father requested that Child be placed with Aunt. Father did not reestablish contact with Child until December of that year. From this evidence, we determine that the district court properly concluded that after the adjudication was reversed by *Shawna C.*, CYFD investigated the possibility of reunifying Father and Child.

**{35}**     In addition, the district court heard testimony that CYFD again considered reunification after the first termination was reversed in *Benjamin O. 2007*. After reversal,

9

CYFD conducted a meeting to discuss the plan, which had two tracks: reunify Father and Child and also pursue permanent placement of Child with Aunt. Child could not be immediately transferred to Father's custody because Father was incarcerated at the time. Father's social worker from that period testified that in order to return Child to Father, CYFD felt that it was necessary to have Father's updated contact information, to instigate contact between Father and Child, and to obtain a physical address so that CYFD could conduct home visits. Over the ensuing months, CYFD attempted but was ultimately unable to achieve these goals.

**{36}** After issuance of *Benjamin O. 2007*, Father consistently refused a home visit by CYFD, even though CYFD informed him that such a visit was necessary in order for him to reunify with Child. He failed to contact CYFD while he was in Georgia so that CYFD could arrange for visits with Child. He failed to maintain telephone contact with Child, despite CYFD's efforts to set up calls through the therapist. Further, the district court found that Father had failed to reestablish contact with Child after the October 2007 phone calls at the therapist's office were unsuccessful. The record supports that finding. This provided sufficient evidence for the district court to conclude that CYFD made reasonable efforts to reunify Father and Child—even though that reunification was not ultimately possible.

**{37}** *Benjamin O. 2007* required not only that CYFD attempt to reunify the family, but also that the district court determine whether CYFD assisted Father with his housing issues. 2007-NMCA-070, ¶ 38. Father contends that CYFD's position—that Father always had sufficient housing—was not reasonable considering the fact that CYFD knew that Father lived in a shelter at times and that he lost his apartment in May 2005. This argument ignores the testimony indicating that CYFD did not require Father to have his own residence or a lease in his name. Rather, CYFD needed Father to provide the address of the place where he lived so that CYFD could conduct a home visit in order to determine whether his home was a suitable place for Child to live. In addition, Father ignores the testimony of a number of social workers, each of whom indicated either that Father did not request assistance with housing or that Father said he had a place to live. The evidence further suggests, as the district court found, that Father refused to provide the addresses of his residences and, as a result, the necessary home visit never happened.

**{38}** Father focuses on CYFD's referral to Time-Limited Reunification (TLR) services and argues that the referral was insufficient to address his housing needs. Specifically, Father contends that "TLR services were not in fact designed to address housing issues but instead to assist with reunification in situations where a parent already has stable housing." This argument again fails to recognize the standard for "stable housing." CYFD was willing to consider placing Child with Father in a shelter in Georgia, in Joy Junction in Albuquerque, with a relative, or in an apartment with roommates. The only requirement was that the housing be safe and stable. Although the TLR referral may not have been adequate assistance to find housing, that is not the issue. The TLR referral does demonstrate that CYFD was serious about reunification. Based on the record, one of the few barriers

10

remaining to reunification was a home visit—and Father refused to provide any address to facilitate that visit.

### 3.      CYFD's Actions

**{39}**      *Benjamin O. 2007* also dictated that the district court make findings regarding whether "the reversed adjudication and/or CYFD's own actions contributed to the new allegations of abuse or neglect against Father." 2007-NMCA-070, ¶ 48. This direction was specifically tied to Father's argument in *Benjamin O. 2007* that his failure to locate stable housing and employment was a result of his attempts to comply with the treatment plan, that Child's removal caused his depression, and that "much of Father's apparent anger stemmed from his belief that Child was wrongly taken into custody." *Id.* ¶ 42. It is necessary to put the current allegations in their proper legal context: CYFD alleged that Father abandoned Child. As a result, we examine whether the allegations of abandonment stemmed from CYFD's own actions or the prior reversed adjudication and termination.

**{40}**      The same facts delineated in the preceding paragraphs are relevant here. Until Father ceased to contact Child, CYFD was making an active effort to maintain their relationship. After the reversal of termination, CYFD arranged for a visit and for numerous phone calls. When Father indicated a desire to move to Colorado, CYFD attempted to conduct the requisite home visit in Denver. Father refused the visit. After Father decided to give Georgia a try, CYFD made an effort to locate him and arrange for visits with Child at her therapist's office. Father made no effort to contact CYFD during this time. CYFD answered Father's complaints regarding the phone calls at Aunt's home by arranging for telephone calls at the therapist's office. Father tried twice and then gave up trying to call. After the failed phone calls in October 2007, Father did not reach out to Child again until March 2008, when he sent packages to her through CYFD.

**{41}**      Since *Benjamin O. 2007*, CYFD has made numerous efforts to bring Father and Child together, and Father's actions have prevented the reunification. There is no evidence that Father's anger or depression prevented him from communicating with Child, and the failure to communicate was the basis for the termination of his parental rights. Accordingly, we hold that clear and convincing evidence supported the district court's finding that CYFD's "new and current allegations of neglect and abandonment are not a result of the prior adjudication or the initial termination of parental rights proceeding."

### III.      CONCLUSION

**{42}**      Because we conclude that clear and convincing evidence supported the district court's determination that Father abandoned Child and that the district court complied with the requirements of *Benjamin O. 2007*, we affirm the district court.

**{43}      IT IS SO ORDERED.**

                                                                **CELIA FOY CASTILLO, Judge**

**WE CONCUR:**

**CYNTHIA A. FRY, Chief Judge**

**ROBERT E. ROBLES, Judge**