IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: <u>April 21, 2017</u>

**NO. 35,472**

**STATE OF NEW MEXICO ex rel.**
**CHILDREN, YOUTH AND FAMILIES**
**DEPARTMENT,**

 Petitioner-Appellee,

v.

**WILLIAM C., JR.,**

 Respondent-Appellant,

and

**IN THE MATTER OF SKYLA C.,**

 Child.

**APPEAL FROM THE DISTRICT COURT OF SANDOVAL COUNTY**
**John F. Davis, District Judge**

Children, Youth & Families Department
Charles E. Neelley, Chief Children's Court Attorney
Santa Fe, NM
Kelly P. O'Neill, Children's Court Attorney
Albuquerque, NM

for Appellee

Law Office of Gina M. Maestas
Gina M. Maestas
Albuquerque, NM

for Appellant

Jay Mueller
Albuquerque, NM

Guardian Ad Litem

**OPINION**

**SUTIN, Judge.**

{1} William C. (Father) appeals from an order terminating his parental rights to his daughter, Skyla C. (Child). After the district court denied the Children, Youth and Families Department's (the Department) first motion to terminate Father's parental rights to Child, a second hearing on a second motion to terminate his parental rights was held. After the second hearing, the court granted the Department's motion and terminated Father's parental rights. On appeal, Father argues that: (1) the district court erred in allowing evidence at the second termination hearing regarding events that occurred prior to the first termination hearing, and (2) there was insufficient evidence to terminate his rights. We hold that the district court did not err in hearing evidence that preceded the first termination hearing and that there was sufficient evidence to terminate Father's rights. We therefore affirm.

**BACKGROUND**

{2} The Department, which had taken custody of Child on September 26, 2013, filed a neglect petition against Father and Child's mother, Allisha V. (Mother), on September 30, 2013. Child and Child's half-brother, who is not Father's biological son and who is not the subject of this appeal, were removed from the home due to concerns about Mother's and Father's alleged substance abuse, domestic violence,

and mental health concerns. After both entered pleas of no contest, judgment was entered against Mother and Father that they neglected Child, pursuant to NMSA 1978, Section 32A-4-2(E)(2) (2009, amended 2016) (current version at Section 32A-4-2(F)(2)), and on February 20, 2014, the district court adopted a treatment plan.

{3} On April 6, 2015, the Department filed its first motion for termination of parental rights as to both parents. After the Department filed its motion, Mother relinquished her rights in Child. The hearing on the motion was set for June 11, 2015. However, prior to the hearing the Department filed an unopposed motion to vacate and reset the hearing because a necessary witness was unavailable that day. The court did not reset the hearing, and the motion for termination of parental rights was heard on June 11, 2015. At the conclusion of that hearing, the court denied the Department's motion, but ordered that custody of Child was to remain with the Department. The Department filed its second motion to terminate Father's parental rights in Child on October 16, 2015, and the hearing on that motion was set for December 10, 2015.

{4} At the beginning of the second termination hearing, the district court took judicial notice of the no contest plea entered into by Father in February 2014. Also, counsel for Father moved to clarify the scope of the inquiry, arguing that the "*Benjamin O.* cases" indicated that the court should only look at what had happened

since the last hearing, i.e., June 11, 2015 to December 10, 2015, and should not consider what happened prior to the last hearing. The court ruled that the Department could present evidence regarding events that preceded that earlier termination of parental rights hearing and could also present any new information concerning what had occurred since the first hearing.

{5} The first witness to testify was Edward Alvarez, who worked for Superior Drug Testing in Las Cruces, New Mexico. Mr. Alvarez testified that Father was referred by the Department on July 8, 2015. According to Mr. Alvarez, it was decided that Father's case worker, Ana Dominguez, would initially make contact with Father to describe the drug-testing procedure and then Father would contact Mr. Alvarez to discuss specifics and any questions. Father initially went to Superior Drug Testing on July 27, 2015, but Mr. Alvarez was not present and no testing was performed. Mr. Alvarez's first interaction with Father was on October 12, 2015, when Father arrived at the office. Father did not call Superior Drug Testing between July 27 and October 12. During Father's October 12 visit, he refused to have a hair follicle test performed. Father next came to the office on October 20, 2015, and a hair follicle test was performed. Father came into the office on October 23, 2015, but no testing was performed. The last time Mr. Alvarez heard from Father was on October 26, 2015. Mr. Alvarez reaffirmed that his understanding was that Ms. Dominguez would

initially explain the process for calling in, but he was unsure if Father had in fact been informed of the procedure on July 27, 2015.

{6}     Anthony DeCorte, a licensed independent social worker and clinical therapist/supervisor at Nava Counseling Services (Nava) in Las Cruces, testified that the Department referred Father for substance abuse and mental health assessments to Nava on June 18, 2015. Father initially missed substance abuse assessments on July 9, 2015 and July 30, 2015, and he missed mental health assessments on November 13, 2015 and November 23, 2015. Mr. DeCorte eventually saw Father on November 30, 2015. Although Father never completed a substance abuse assessment, part of Father's mental health assessment evaluated his substance abuse issues. Mr. DeCorte diagnosed Father as having panic disorder, cannabis-use disorder, and stimulant-use disorder and recommended that Father participate in individual therapy, an anger management treatment group, and substance abuse treatment. He informed Father of those recommendations, Father was "open" to them, but to Mr. DeCorte's knowledge services had not started. He noted that Father's diagnoses would not necessarily prevent a person from being able to parent a child, as long as treatment was being received.

{7}     Wade C., Father's brother, testified that Child had been living with him since August 2015 and that he was willing to adopt her. He stated that Child needs

4

consistency, structure, and counseling for her anxiety, depression, and learning disabilities. He had contact with Father maybe once every two months, and he was unaware of where Father was living or whether Father had a job. He expressed concerns about Child's needs and did not believe Father could meet those needs. He indicated that Father had a visit with Child several weeks before the hearing and had missed a visit the week before the hearing. Wade C. testified that Child exhibited depression after missing that visit with Father and that Child's depression and anxiety minimizes "when there is a consistent period of no contact" with Father. He testified that he has two other children and that they relate to Child like siblings.

{8} Leslie Peterson was Father's permanency planning case worker from October 2014 to May 2015. Ms. Peterson referred Father for therapy at Mesilla Valley Hospital in Las Cruces and for urinalyses. She also referred Father to La Frontera in Las Cruces to assist him in dealing with his addictions. She reported that Father was inconsistent in attending therapy, and she spoke with Father sporadically. In November 2014 Father was "on track," had electrical contracting work, and was living in a home with roommates. After that Father was inconsistent, and by January 2015 Father was living at a church office. Father told Ms. Peterson that he missed the therapy sessions because he was busy or because of conflicts with his job requirements. While she had the case, Ms. Peterson did not see Father make any

progress toward alleviating the causes and conditions that brought Child into the Department's custody.

{9} Dr. Marc Caplan, a licensed psychologist, testified that, pursuant to the Department's referral, he conducted a psychological evaluation of Father in November 2014. In addition to a clinical interview, Father was administered a battery of tests. Father was cooperative but did not offer many details and complained he was not feeling well the day of the assessment. The tests administered to Father showed that Father functioned at a "borderline to low average range of intelligence," had difficulty communicating verbally, and struggled with "organizing his thoughts." Father seemed to struggle with "expansive mood[s]," and there were indications of psychotic and disorganized thinking that may have corresponded "to what [Father] reported as earlier diagnoses of anxiety disorder and possibly schizophrenic disorder." Although Father did not show any positive signs of schizophrenia during the evaluation, Dr. Caplan did note some minor indications of the negative signs of schizophrenia, i.e., affect and organization of thinking issues. Based on tests related to child abuse potential and parenting stress index, Father showed rigidity and presented with distress and depression, which Dr. Caplan stated were "likely to contribute to making parenting more difficult." Dr. Caplan noted that Father perceives Child as demanding, which can be overwhelming for Father. Father had a

6

general sense of how to approach limit-setting and boundary-setting with Child but tends to be inconsistent. Father admitted to regular use of marijuana to calm him, and Dr. Caplan indicated that Father could struggle to care for Child if not engaged in treatment and ongoing parent training. Dr. Caplan diagnosed Father with an "unspecified schizophrenic-spectrum disorder." Father indicated to Dr. Caplan that he was not in treatment at the time of the evaluation. Dr. Caplan emphasized that Father's elevated score on the child abuse potential does not necessarily show that he has or will abuse a child, but merely indicated that he looks like a population that is known to have abused. Father self-reported irritability and hostility, and Dr. Caplan indicated that those responses could impact a child in an adverse manner. Dr. Caplan acknowledged that treatment possibly could be effective for Father, but expressed concern that Father was inclined to "externalize responsibility," meaning that Father felt that the problems he was experiencing were everyone else's fault.

{10} Jeromy Brazfield testified that he was the investigations supervisor in this case in September 2013. Mr. Brazfield participated in a family centered meeting in 2013 at which point Child was placed on a forty-eight-hour hold. At the time of the family centered meeting, Father was involved in vocational rehabilitation services. Although the investigator on the case instructed that a release should be obtained from Father to secure additional services, the Department had difficulty getting signed releases

7

from Father. Mr. Brazfield supervised at least two drug tests administered to Father and recalled that visits were to be set up with Child and Father.

{11}     Misty Castillo, a permanency planning case worker supervisor, testified that Child came into the Department's custody in September 2013 due to concerns about Mother's and Father's alleged substance abuse, domestic violence, and concerns about mental health. Ms. Castillo began supervising the case in June 2014. She testified that referrals were made to service providers in Albuquerque, New Mexico, and in Las Cruces. Father was referred to La Frontera in Las Cruces for individual counseling, substance abuse group sessions, a psychiatric evaluation, and a referral was also made for a psychological evaluation. He was also referred to Superior Drug Testing for random drug screens.

{12}     In the summer of 2014, Child was placed with her paternal grandparents and supervised visits were to occur once a week. Ms. Castillo did not receive any records regarding drug tests from Superior Drug Testing but was aware that Father had called in on one occasion. Father reported to the Department that he was living in different places at the time, including with a roommate in a converted garage, in his car, and in a church office. To Ms. Castillo's knowledge, Father did not have a steady job in 2014, although he did report having some electrical work. Father reported to Ms. Castillo that he was receiving treatment but she was unable to confirm that. In an

attempt to confirm Father's reports, the Department reached out to La Frontera a number of times but was unable to reach them due to La Frontera's transition and ultimate closure. Ms. Castillo testified that the Department was looking for progress on sobriety, mental health, as well as stable housing and employment, but she did not see that Father made any progress while she was involved in the case. Ms. Castillo did not believe Father could safely parent Child at the time of the hearing.

{13}    Ms. Dominguez, one of Father's case workers, testified that she was assigned to Father's case in June 2015. Ms. Dominguez discussed Father's treatment plan with him face-to-face in July 2015, at which time Father indicated he was already aware of the plan. Ms. Dominguez made a substance abuse referral to Nava in June 2015 and followed up with them approximately six times to monitor Father's progress. Father was informed of the referral in June or July 2015 and was informed that Nava was going to see him for substance abuse, domestic violence, and mental health. Ms. Dominguez informed Father that Nava would be calling, and then later, when Father did not receive a call, he was told to call Nava. Father completed his assessment with Nava on November 30, 2015. Per the treatment plan, Father signed releases when asked by Ms. Dominguez and provided names to the Department "for relative placement." Ms. Dominguez discussed random drug testing with Father, and he provided one sample for a hair follicle test and one sample for a urinalysis test. Ms.

Dominguez inspected the office where Father was living and noted that there was no second bedroom where Child could stay, and it was not an appropriate living space for Child. Father indicated to Ms. Dominguez that he was looking for an apartment that would be appropriate for Child, but Ms. Dominguez testified that he was still living in the office at the end of October 2015. To Ms. Dominguez's knowledge, Father had not completed any domestic violence program.

{14}   As to visitation, which was also part of the treatment plan, Father initially had visits with Child through Father's parents. However, in August 2015, after a family centered meeting that Father missed, Child was moved to Wade C.'s home and a referral was made to Family Youth, Inc. (FYI) to assist with supervised visitation. Father was told to contact FYI to fill out an intake form for visitation. Father contacted FYI in November 2015, and to Ms. Dominguez's knowledge, he attended one visit and missed one visit. When Ms. Dominguez first took over the case in June 2015, she had regular contact with Father. However, it became difficult to reach Father beginning in the middle of July/August 2015. In the months of August through November 2015, she was only able to speak with Father once a month. Ms. Dominguez did not believe Father was able to meet Child's needs at the time of the hearing. He had not alleviated the causes and conditions that brought Child into custody, nor would he be able to in the foreseeable future.

10

{15}     Father was the final witness to testify. Father testified that he secured housing and that he had been living there for the past two and a half months. Father performs electrical work for his landlords, their family, and also for his father. Father testified that he had approximately five Department case workers over the course of the case and that he had difficulty with the treatment plan because of his unpredictable work schedule. He testified that he sees a psychiatrist once every three months, and he is prescribed medication. He also stated that he has received a variety of mental health diagnoses. Father also testified that, in August 2014, he was hit by a drunk driver and suffered a back injury and that he informed Ms. Dominguez of that injury. Father stated that he was misinformed about the family centered meeting in August 2015, and he felt "left in the dark." Father testified that he attended a parenting class, as well as individual and group therapy at La Frontera in 2014. Father expressed that he loved Child and would do what it took to work on his mental health issues. He requested that he be permitted to attend "rehab" and then be allowed a month, after completing rehab, to show that he could meet Child's needs. On cross-examination, Father admitted to having been arrested and charged in El Paso, Texas in September 2015 for drug paraphernalia.

{16}     The district court entered findings of fact and conclusions of law on January 28, 2016, concluding in relevant part that Father had not alleviated the causes and

conditions that brought Child into custody and that the causes and conditions were unlikely to change in the foreseeable future despite reasonable efforts by the Department to assist Father. An order terminating Father's parental rights was filed on February 10, 2016, and this appeal followed.

**DISCUSSION**

{17}    On appeal, Father makes two arguments: (1) that the district court erred in not limiting the evidence to events that occurred after the first termination of parental rights hearing, and (2) that there was insufficient evidence Father had not alleviated the causes and conditions that led to Child being taken into custody by the Department or that he would not do so in the foreseeable future. We address each argument in turn.

**I.    Limitation on Evidence**

{18}    Father argues that under the reasoning of *State ex rel. Children, Youth & Families Department v. Benjamin O.* (*Benjamin O. I*), 2007-NMCA-070, 141 N.M. 692, 160 P.3d 601, the district court erred in failing to limit evidence at the second hearing to events that occurred after the first hearing. To the extent our analysis requires interpretation of the Abuse and Neglect Act, NMSA 1978, §§ 32A-4-1 to -34 (1993, as amended through 2016), our review is de novo. *Benjamin O. I*, 2007-NMCA-070, ¶ 24. Before addressing the parties' specific arguments regarding any

limitation on the evidence in this case, we find it useful to give a brief history of the *Benjamin O.* cases, including the 2007 case upon which Father relies.

{19}     The first case in the *Benjamin O.* saga, *State ex rel. Children, Youth & Families Department v. Shawna C.*, 2005-NMCA-066, 137 N.M. 687, 114 P.3d 367, dealt with the district court's adjudication that the mother and the father abused and neglected their daughter. *Id.* ¶ 1. In *Shawna C.*, this Court reversed the adjudication of abuse or neglect as to the father, noting that "[e]vidence of [the f]ather's somewhat aged criminal history, his anger, his mental health issues as diagnosed by the psychologist, and the fact that he 'permitted' [his mother] to care for [the c]hild while [his mother] ingested drugs, while not reflecting exemplary behavior, does not support anything more than a vague inference of future harm." *Id.* ¶ 22. However, while the parents' appeal as to the adjudication was pending, the district court continued to monitor the case, and the Department ultimately filed a motion to terminate the parental rights of both parents. *Id.* ¶¶ 7-12; *see Benjamin O. I*, 2007-NMCA-070, ¶ 1.

{20}     The parties learned of this Court's opinion in *Shawna C.* on the last day of the hearing on the Department's motion to terminate parental rights as to the mother and the father, and upon learning of that opinion, the district court ordered the hearing continued and asked that briefs be submitted by the parties on the issues raised by the opinion in *Shawna C. Benjamin O. I*, 2007-NMCA-070, ¶¶ 13, 14. After considering

both parties' arguments regarding the district court's role post-*Shawna C.*, the court ruled that it had jurisdiction to hear the motion to terminate and granted the Department's request to conduct further investigation with respect to the father and to reopen the termination hearing if necessary. *Benjamin O. I*, 2007-NMCA-070, ¶¶ 14-18. Less than two months after the adjudication was reversed, the Department filed supplemental allegations regarding the father in support of its motion to terminate his parental rights, and after the Department presented additional evidence, the father's rights were terminated. *Id.* ¶¶ 19-22. That termination was appealed and resulted in this Court's opinion in *Benjamin O. I*, 2007-NMCA-070.

{21}    In *Benjamin O. I*, we stated that the issue presented was "what happens after an adjudication of abuse or neglect is reversed during termination of parental rights proceedings." *Id.* ¶ 23. In analyzing the father's arguments on appeal, we held that "[w]hile we do not disagree with [the f]ather's assertion that the district court may not rely on an adjudication of abuse or neglect that has been reversed on substantive grounds," we were not convinced that the district court so relied, and we specifically noted that the father's rights could still be terminated based on his current inability to care for the child. *Id.* ¶ 33. Although we held that the father's rights could ultimately be terminated, we reversed the district court's order terminating his

14

parental rights and remanded the case due to a lack of specific findings by the district court. *Id.* ¶¶ 33, 47-48.

{22} Approximately one year after we issued our opinion in *Benjamin O. I* and remanded the case, the Department filed an amended motion to terminate the father's parental rights. *State ex rel. Children, Youth & Families Dep't v. Benjamin O. (Benjamin O. II)*, 2009-NMCA-039, ¶¶ 7, 10, 146 N.M. 60, 206 P.3d 171. "The motion realleged the original allegations and the 2005 supplemental allegations[,] . . . [and] new allegations of abandonment or presumptive abandonment." *Id.* ¶ 10. After a three-day hearing on the motion, the district court entered extensive findings of fact and conclusions of law and entered a judgment terminating the father's parental rights. *Id.* That termination was appealed and resulted in our opinion in *Benjamin O. II*, 2009-NMCA-039, in which "we conclude[d] that clear and convincing evidence supported the district court's determination that [the f]ather abandoned [the c]hild and that the district court complied with the requirements of *Benjamin O.* [*I*]." *Benjamin O. II*, 2009-NMCA-039, ¶ 42.

{23} In the present case, Father argues that our statement in *Benjamin O. I* that the Department could seek termination by bringing "new or current allegations of abuse, neglect, or abandonment to the district court's attention" means that termination can only be pursued based on facts that occurred after the district court's denial of the

15

first motion to terminate. 2007-NMCA-070, ¶ 39. Father argues that, because the court in this case denied the Department's first motion to terminate due to a lack of clear and convincing evidence that the statutory requirements for termination had been satisfied, the Department was limited to presenting evidence of abuse or neglect after the district court's June 2015 denial of the Department's motion. Father argues that it was unfair to hold past conduct against him, and the focus should have been on Father's situation since June 2015.

{24}    The Department responds that the facts in *Benjamin O. I* are not analogous to the present case and thus the district court did not err in allowing testimony regarding events that occurred prior to the first termination hearing. According to the Department, the issue before this Court in *Benjamin O. I* was "what steps the district court and [the Department] should take following the appellate reversal on substantive grounds of a prior adjudication of abuse and neglect while [the Department] is in the process of attempting to terminate a parent's parental rights." *Id.* ¶ 1. The Department argues that in this case, Father stipulated at the adjudicatory hearing that Child was neglected and does not challenge the finding of neglect on appeal. The Department notes that its first attempt to terminate Father's parental rights was unsuccessful because it did not present evidence regarding its efforts to assist Father, and thus the court could not determine whether its efforts were

reasonable. The Department argues that the fact the first motion was denied does not make all preceding evidence irrelevant. Finally, the Department asserts that even if it was required to limit the evidence presented at the second termination hearing to events that occurred after the first termination hearing, the judgment is still supported by substantial evidence, noting Father's ongoing substance abuse and mental heath issues, lack of participation in the process, inconsistent contact with the Department, and minimal visitation with Child.

{25} We hold that to the extent *Benjamin O. I* limits the Department's ability to present prior evidence when an adjudication is overturned on appeal, it does not apply here because this case does not deal with a reversed adjudication. None of the *Benjamin O.* cases stand for the proposition that when a motion for termination of parental rights is denied, all evidence preceding that denial must be ignored in future attempts to terminate parental rights. To ignore all preceding evidence when there is no dispute as to the adjudication of abuse or neglect, which could include a parent's history of compliance, information about the causes and conditions that led to the child being taken into custody, attempts to alleviate those causes and conditions, etc., would be to limit the district court's access to information that is needed to appropriately assess whether a parent's parental rights should be terminated. We decline to extend *Benjamin O. I* because doing so would force courts to make

important decisions based on information that is incomplete or without needed context.

{26}    Because *Benjamin O. I* is not applicable and because we see no value in extending its application to this case, we conclude that the district court did not err in allowing the Department to present evidence of events preceding the first hearing on the first motion to terminate parental rights.

## II.    Sufficiency of the Evidence

{27}    "The standard of proof in cases involving the termination of parental rights is clear and convincing evidence." *State ex rel. Children, Youth & Families Dep't v. Vanessa C.*, 2000-NMCA-025, ¶ 24, 128 N.M. 701, 997 P.2d 833. "Clear and convincing evidence" is defined as evidence that "instantly tilt[s] the scales in the affirmative when weighed against the evidence in opposition and the fact[-]finder's mind is left with an abiding conviction that the evidence is true." *In re Termination of Parental Rights of Eventyr J.*, 1995-NMCA-087, ¶ 2, 120 N.M. 463, 902 P.2d 1066 (internal quotation marks and citation omitted). We "view the evidence in the light most favorable to the prevailing party, and . . . determine therefrom if the mind of the fact[-]finder could properly have reached an abiding conviction as to the truth of the fact or facts found." *State ex rel. Children, Youth & Families Dep't v. Michelle B.*,

18

2001-NMCA-071, ¶ 12, 130 N.M. 781, 32 P.3d 790 (internal quotation marks and citation omitted).

{28}    In this case, the district court terminated Father's parental rights pursuant to Section 32A-4-28(B)(2), which provides for termination when:

> the child has been a neglected or abused child as defined in the Abuse and Neglect Act and the court finds that the conditions and causes of the neglect and abuse are unlikely to change in the foreseeable future despite reasonable efforts by the department or other appropriate agency to assist the parent in adjusting the conditions that render the parent unable to properly care for the child.

{29}    Father does not dispute that Child was a neglected child; however, Father argues on appeal that there was insufficient evidence that he had not alleviated the causes and conditions that led to Child being taken into custody or that he would not do so in the foreseeable future despite reasonable efforts by the Department. Specifically, he contends that he made efforts to comply with his treatment plan and was progressing and that the Department failed to make reasonable efforts to assist him with his treatment plan by not obtaining a clear assessment of his mental health. Father points to testimony that there were many different Department workers assigned to his case, that La Frontera closed, and that there was confusion about what he was required to do with various referrals. He also asserts that he was confused about the visitation process and attributes his inconsistency to the car collision that he was in and to his work schedule. He argues that despite his struggles with the

19

treatment plan, he attended two assessments, participated in two drug tests, was set up for visitation, had obtained housing, and participated in some classes and therapy at La Frontera prior to its closure. Father also argues that the Department did not make reasonable efforts to assist him because he did not receive a clear assessment of his mental health diagnoses. He asserts that because Dr. Caplan's and Mr. DeCorte's diagnoses were different, he never received accurate and definitive diagnoses and did not receive appropriate treatment.

{30} The Department responds that the fact Dr. Caplan's and Mr. DeCorte's assessments differed does not mean that they were inaccurate or that the Department's efforts to assist Father were unreasonable. The Department notes that the assessments occurred a year apart, and the circumstances surrounding each evaluation were different. The Department also highlights a number of efforts to assist Father, including its numerous, appropriate referrals to assist Father in addressing his issues, its attempts to maintain contact with Father, and its efforts to give Father an opportunity to regularly visit with Child. The Department then disputes Father's position that clear and convincing evidence did not support the district court's finding that Father had not alleviated the causes and conditions of neglect or would be unable to in the foreseeable future. In support of its argument, the Department notes that Father had made little to no progress, did not consistently participate in counseling,

did not maintain contact despite efforts by the Department, and did not show how his work schedule prevented him from participating in treatment. The Department also argues that the evidence Father construes as showing effort instead shows that Father made no effort to timely follow through with recommendations. The Department states that Father had not started therapy and group sessions, had only participated in two drug tests over a six-month period, only made minimal effort to visit with Child, and, in fact, had missed a visit just one week prior to the termination hearing. The Department highlights the fact that Child had been in custody for over two years by the time of the second termination hearing and argues that it is reasonable to infer that he would not be able to address his substance abuse and mental health issues in the foreseeable future.

{31} We hold that there was sufficient evidence for the district court to conclude that Father had not alleviated the causes and conditions that led to Child being taken into custody and that he would not do so in the foreseeable future, despite reasonable efforts by the Department to assist Father. As noted by the Department, Father was not consistent in attending treatment or counseling services despite numerous referrals and the fact that both Dr. Caplan and Mr. DeCorte indicated that services were needed. Father missed two substance abuse assessments and only completed a mental health assessment less than two weeks prior to the second termination hearing.

21

Father's participation in drug screenings was inconsistent, and he attributed his lack of participation to his schedule. Father waited two months to fill out the intake paperwork with FYI to begin supervised visitation with Child once she was moved to her uncle's residence, and although Father testified that he had recently secured housing, the court found that he did not have stable housing as required by his treatment plan, and the Department had not confirmed nor conducted a home visit of that residence. Father was inconsistent in his contact with the Department, even though he was ordered to maintain contact as part of his treatment plan.

{32}     Although Father attempts to bolster his position by highlighting evidence that he believes shows some progress, our standard of review requires us to view the evidence in the light most favorable to the prevailing party and determine whether the clear and convincing evidence standard was met, "not whether the trial court could have reached a different conclusion." *State ex rel. Children, Youth & Families Dep't v. Patricia H.*, 2002-NMCA-061, ¶ 31, 132 N.M. 299, 47 P.3d 859. Given that standard and the evidence presented in this case, we conclude that the evidence supported termination of Father's parental rights in Child.

**CONCLUSION**

{33}     For the reasons set forth in this opinion, we affirm.

22

{34}    **IT IS SO ORDERED.**


_____

**JONATHAN B. SUTIN, Judge**

**WE CONCUR:**


_____

**M. MONICA ZAMORA, Judge**


_____

**HENRY M. BOHNHOFF, Judge**